

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-31-1995

# Mark v Borough of Hatboro

Precedential or Non-Precedential:

Docket 94-1722

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"Mark v Borough of Hatboro" (1995). *1995 Decisions.* Paper 88.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/88

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————————

No. 94-1722

————————————

JOHN D. MARK,

Appellant

v.

BOROUGH OF HATBORO, THOMAS E. McMACKIN,
CHARLES J. ACKER, BUCKY L. CLARK, ROBERT S. DOORLEY,
DOTTIE NEWSOME, JOHN G. YOUNGLOVE, ESQUIRE,
ALFRED F. ZOLLERS, ROBERT STAUCH, MICHAEL BARGER
ROY THOMAS, JOSEPH READING, JOHN SINE,
WILLIAM MARLEY, III, ENTERPRISE FIRE COMPANY

————————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 92-cv-7354)

————————————

Argued December 20, 1994

BEFORE:  GREENBERG, SAROKIN, and WEIS, Circuit Judges

(Filed:  March 31,1995)

————————————

Robert W. Small (argued)
Berlinger & Small
1494 Old York Road, Suite 200
Abington, PA  19001

Attorney for Appellant

Larry D. Jackson (argued)
Harris & Silverman
1650 Arch Street
25th Floor
Philadelphia, PA  19103

Attorney for Appellee the
Enterprise Fire Company

Juliana P. Maffei (argued)
Joseph A. Santarone
Marshall, Dennehey, Warner,
Coleman & Goggin
1845 Walnut Street Tower
Philadelphia, PA  19103

Attorneys for Appellees
Borough of Hatboro,
Thomas E. McMackin,
Charles J. Acker, Bucky
L. Clark, Robert S.
Doorley, Dottie Newsome,
John G. Younglove,
Esquire, Alfred F.
Zollers, Robert Stauch,
Michael Barger, Roy
Thomas, Joseph Reading
and John Sine

---

**OPINION OF THE COURT**

---

GREENBERG, <u>Circuit Judge</u>.

### I.  Introduction

On March 5, 1991, defendant William Marley III, a member of the Enterprise Fire Company, a volunteer fire company in the Borough of Hatboro, Pennsylvania, set fire to and destroyed plaintiff John D. Mark's automobile repair business. The question on this appeal is whether the Borough and Enterprise can be held liable under 42 U.S.C. § 1983, the federal civil rights statute, for damages resulting from the arson.  The district court granted defendants' motions for summary judgment,

basing the decision on its finding that Enterprise was not a state actor for section 1983 purposes, and that it operates independently of the Borough.  We conclude that the district court erred in holding that Enterprise is not a state actor.  Nonetheless, our review of the record compels the conclusion that the defendants cannot be held responsible under section 1983 for the harm that occurred.[1]  We, therefore, will affirm the grant of summary judgment.

## II.  Factual background and procedural history

Enterprise is a private association of volunteers which has served the Borough of Hatboro since 1890.  Mark v. Borough of Hatboro, 856 F. Supp. 966, 968 (E.D. Pa. 1994).  In its day to day operations, Enterprise essentially acts autonomously; it owns the fire station and the fire fighting equipment, elects its own officers, prepares its own budget and maintains its own recruitment and training practices.  However, on September 28, 1987, Enterprise signed an agreement with the Borough, agreeing to provide fire protection services to the Borough in return for the latter's imposition of a fire tax.  The Borough insures Enterprise's equipment, and the fire tax funds Enterprise's operations and expenditures.  Id. at 973-74.

According to Enterprise's by-laws (as of June 16, 1989), "[a]ny person shall be eligible to

---

[1].  Of course, we can affirm on a ground on which the district court did not rely but which was raised before it.  See Neely v. Zimmerman, 858 F.2d 144, 149 (3d Cir. 1988).

be a regular member of the Company if they are eighteen (18) years of age or older and they are of good moral character." Enterprise Fire Company of Hatboro, Pennsylvania By-Laws at app. 59. The by-laws provide the following procedure for admitting an applicant to membership: (1) An application for regular member [sic] must be made in writing on forms provided by [Enterprise]. The applicant must submit the completed form co-signed by a regular member in 'good standing' who shall be considered the 'proposing member'. A fee of three ($3.00) dollars shall accompany the application.

(2) The Membership Committee shall be in charge of membership and they shall be responsible for the production, distribution and receipt of completed application forms and fees.

(3) Following the submission of the completed application and payment of the fee the Membership Committee shall arrange for the applicant and proposing member to attend the next regular membership meeting when both parties are available.

(4) The applicant and proposing member shall appear at the regular membership meeting at which time the Membership Committee shall introduce the applicant to the regular membership. The application shall then be referred to the Membership Committee for an investigation and recommendation for 'probationary membership'.

>    (5)  At the subsequent regular membership
>    meeting the Membership Committee shall report
>    on the application.  If a 'favorable report'
>    is submitted than [sic] the regular
>    membership shall vote to determine whether
>    the applicant shall be accepted for
>    'probationary membership.'  Said vote shall
>    be made by the show of hands and three (3) or
>    more negative votes shall be necessary to
>    defeat the application . . . .

By-laws at app. 59-60.  The application is a two-page questionnaire that asks, among other things, whether the applicant has "every [sic] been under the care of or committed to any institution for any nervous condition, mental illness, alcoholism or use of drugs."  App. 1-2.

Marley filled out and signed the application on May 9, 1986, and answered "no" to the foregoing question.  Id.  On May 19, 1986, Enterprise made him a probationary member, and it appears that in May, 1988 he became a regular member.  Id. at 1.[2] It is undisputed that prior to the Mark fire, Enterprise "never considered the need for psychological testing to identify firefighters having a propensity to commit arson. . . .  Neither did it receive any advice as to whether existing members or applicants for firefighter status could be identified as potential arsonists."  Brief of Enterprise Fire Company at 10. According to Mark's interpretation of expert reports, however, Marley had a psychologically troubled background which would have

---

[2].  The delay between Marley's probationary membership and regular membership apparently was due to the fact that Marley only turned 18 on May 3, 1988.

indicated to trained observers that he was not fit to be a firefighter. Additionally, while working as a volunteer firefighter, Marley had a serious drinking problem and, on one occasion, "was cautioned by other members to stay away from the fire officers at the scene [of a fire] because he smelled so strongly of alcohol." Supplemental Statement of Dian Williams, President of Center for Arson Research, July 11, 1993 at app. 946.

On December 23, 1992, Mark filed a complaint against the Borough, several Borough officials, and Enterprise in the United States District Court for the Eastern District of Pennsylvania to recover his losses from the fire.[3] His complaint alleged that Enterprise's and the Borough's failure to follow adequate policies to ensure that applicants to the fire department were screened sufficiently for tendencies towards arson caused the damage to his property.[4] Mark claimed that this duty to screen is compelled constitutionally, and that the danger of volunteer firefighters committing arson is so grave and so obvious that the defendants' failure to follow such a policy evinced willful disregard for the rights of individuals with whom the firefighters came in contact. Mark further alleged that if

---

[3]. The complaint also stated common law tort claims against Marley but these claims are not before us on this appeal and we do not address them.

[4]. Mark also claims that the defendants had a duty to perform periodic screenings of firefighters and to train firefighters to identify potential arsonists in the company. We discuss all of these claims under the rubric of "failure to screen."

Enterprise had a policy of psychologically screening applicants or of training its firemen to spot potential arsonists, it would have discovered that Marley was unfit to serve as a volunteer firefighter and it never would have admitted him into membership, so that Marley would not have started the fire. Mark claimed relief pursuant to 42 U.S.C. § 1983 and under state law. The parties have considered the Borough officials on the same basis as the Borough itself, and consequently we shall treat this case as involving only two defendants, Enterprise and the Borough.[5]

On February 25, 1993, the Borough moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief could be granted. On March 2, 1993, Enterprise made a similar motion. On April 8, 1993, the district court granted Enterprise's motion to dismiss counts 2 and 3, which alleged, respectively, negligence and willful and wanton conduct, but the district court denied the remainder of the motions.

On December 28, 1993, the defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56(b). In their motion papers, they made a series of alternative arguments, including the following: (1) Enterprise was not a state actor for section 1983 purposes, and therefore Mark had no federal cause of action; (2) the Due Process Clause of the Fourteenth Amendment imposes no duty upon local governments to provide adequate fire protection

---

[5]. Mark did not specify whether he was suing the individual defendants in their official or individual capacities.

or to protect the public from fire; (3) no local governmental entity has a due process duty to protect the public against violent acts of private persons; (4) even if Mark's constitutional rights were violated, he failed to demonstrate that the defendants' failure to screen applicants psychologically for membership evinced deliberate indifference; (5) the causal link between the failure to screen and the arson was too remote to support the imposition of liability.

In an opinion and order dated June 30, 1994, reported at 856 F. Supp. 966 (E.D. Pa. 1994), the district court granted defendants' motion. The court first addressed the state actor argument, and found that firefighting in Pennsylvania never has been an exclusive function of the government, and that there is an insufficient connection between the municipality and Enterprise to justify imposing state actor status on Enterprise. Id. at 970-76. It went on to reason that "[s]ince [the Borough] has no control over [Enterprise's] employment practices in the first place, and since [Enterprise's] acts do not fairly represent official policy, the Borough's policy or lack of policy regarding [Enterprise's] screening of new applicants is not actionable under § 1983." Id. at 976. Upon dismissing the federal claims against both the Borough and Enterprise, pursuant to 28 U.S.C. § 1367(c)(3) the district court declined to exercise supplemental jurisdiction over the remaining state law claims, and thus it dismissed those claims without prejudice.

Mark filed a timely notice of appeal from the district court's order. We have jurisdiction pursuant to 28 U.S.C. §

1291, as the appeal is from a final order disposing of all claims in the complaint. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. We exercise plenary review over the district court's grant of summary judgment. Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1423 (3d Cir. 1994). Thus, "we must determine whether 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [the moving party] is entitled to a judgment as a matter of law.'" Id. at 1423 (quoting Fed. R. Civ. P. 56(c)). As we recently described:

> '[I]n applying this standard, "all inferences must be drawn against the movant, . . . and in favor of the nonmovant."' [FDIC v. Bathgate, 27 F.3d 850, 860 (3d Cir. 1994)] (quoting Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir. 1988)). However, '"where the movant has produced evidence in support of its motion for summary judgment, the nonmovant cannot rest on the allegations of pleadings and must do more than create some metaphysical doubt."' Id. (quoting [Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir.), cert. denied, 114 S.Ct. 554 (1993)]).

Id. at 1423.


### III. Discussion


In cases involving the scope of liability under a federal statute, it always is appropriate to begin with the statutory language. 42 U.S.C. § 1983 provides in pertinent part that:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of
> any State or Territory, subjects, or causes
> to be subjected, any citizen of the United
> States or other person within the
> jurisdiction thereof to the deprivation of
> any rights, privileges, or immunities secured
> by the Constitution and laws, shall be liable
> to the party injured in an action at law,
> suit in equity, or other proper proceeding
> for redress.

"By its terms, of course, the statute creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." City of Oklahoma City v. Tuttle, 471 U.S. 808, 816, 105 S.Ct. 2427, 2432 (1985) (plurality opinion). Thus, "[t]o establish a claim under 42 U.S.C. § 1983, [a plaintiff] must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993). Here, Mark claims that he was deprived of his substantive due process rights guaranteed by the Fourteenth Amendment. The district court opinion focused principally on whether Enterprise could be considered a state actor for section 1983 purposes. That is where, then, we will begin our analysis.

### A. Is Enterprise a State Actor?

"Although a private [party] may cause a deprivation of . . . a right, [it] may be subjected to liability under § 1983 only when [it] does so under color of law." Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 156, 98 S.Ct. 1729, 1733 (1978). The

Supreme Court has clarified that "[i]n cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." United States v. Price, 383 U.S. 787, 794 n.7, 86 S.Ct. 1152, 1157 n.7 (1966) (quoted in Lugar v. Edmondson Oil Co., 457 U.S. 922, 928, 102 S.Ct. 2744, 2749 (1982) [hereinafter "Lugar"]), and Rendell-Baker v. Kohn, 457 U.S. 830, 838, 102 S.Ct. 2764, 2769-70 (1982). The state action principle is stated succinctly as follows: "[A]t base, 'constitutional standards are invoked only when it can be said that the [government] is responsible for the specific conduct of which the plaintiff complains.'" Edmonson v. Leesville Concrete Co., 500 U.S. 614, 632, 111 S.Ct. 2077, 2089 (1991) [hereinafter "Edmonson"] (O'Connor, J. dissenting) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785-86 (1982)) (alterations in original). Put differently, deciding whether there has been state action requires an inquiry into whether "there is a sufficiently close nexus between the State and the challenged action of [Enterprise] so that the action of the latter may be fairly treated as that of the State itself." Blum v. Yaretsky, 457 U.S. at 1004, 102 S.Ct. at 2786 (internal citation omitted).

The Supreme Court in varying circumstances appears to utilize three discrete tests to determine whether there has been state action. See Haavistola v. Community Fire Co. of Rising Sun, 6 F.3d 211, 215 (4th Cir. 1993). The first inquiry asks whether "the private entity has exercised powers that are traditionally the exclusive prerogative of the state." Blum v.

Yaretsky, 457 U.S. at 1004–05, 102 S.Ct. at 2786 (emphasis added) (internal citation omitted).  Years ago, the Court applied this test somewhat liberally, holding, for example, that a town owned by a private company performs a public function and therefore is a state actor, see Marsh v. Alabama, 326 U.S. 501, 507, 66 S.Ct. 276, 279 (1946), and that a private organization conducting pre-primary elections for the purpose of sending its candidates to the primary election, engaged in an exclusive public function. Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809 (1953).  See also Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486 (1966) (public park could not be operated with racial restriction even when trustees had no connection to city government).

However, the Court came increasingly to emphasize the "exclusivity" aspect of the test, and rarely found that plaintiffs had met that rigorous standard.  Thus, in Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449 (1974), the Court held that a private utility company, extensively regulated by the state, and apparently holding at least a partial monopoly in its territory, did not act under color of state law, in part because the state where the utility was engaged in business had "rejected the contention that the furnishing of utility services is either a state function or a municipal duty." Id. at 353, 95 S.Ct. at 454.  Similarly, in Rendell-Baker v. Kohn, the Court held that a private entity engaged in the education of maladjusted high school students did not perform an exclusively public function because "[the state's] legislative policy choice [to fund the private school] in no way makes these services the

exclusive province of the State."  457 U.S. at 842, 102 S.Ct. at 2772; see also Black v. Indiana Area Sch. Dist., 985 F.2d 707, 710-11 (3d Cir. 1993) (private contractor providing state school bus program at state expense not performing exclusive state function).  In sum, the exclusive public function test rarely could be satisfied.

The second discrete inquiry asks whether "the private party has acted with the help of or in concert with state officials."  McKeesport Hospital v. Accreditation Council for Graduate Medical Ed., 24 F.3d 519, 524 (3d Cir. 1994).  Thus, in Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598 (1970), the Court held that a conspiracy between a private party and a state official to engage in unlawful discrimination constituted action "'under color' of law for purposes of the statute."  Id. at 152, 90 S.Ct. at 1606.  Similarly, in Lugar a private party's prejudgment attachment of another party's property, pursuant to a state statute, constituted state action under section 1983. Lugar, 457 U.S. at 941-42, 102 S.Ct. at 2756.

Finally, the third scenario involves situations in which "[t]he State has so far insinuated itself into a position of interdependence with . . . [the acting party] that it must be recognized as a joint participant in the challenged activity." Krynicky v. University of Pittsburgh, 742 F.2d 94, 98 (3d Cir. 1984) (quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 725, 81 S.Ct. 856, 862 (1961)), cert. denied, 471 U.S. 1015, 105 S.Ct. 2018 (1985) (alterations in original).  Burton was a

classic application of this symbiotic relationship test. There,

the Court deemed a private restaurant's discriminatory act state

action because the restaurant was located in a building owned by

the Wilmington Parking Authority, an agency of the state.

Because of the arrangement between the Parking Authority and the

restaurant, under which the State of Delaware benefitted

financially from its lessee's business, the Court held that

Delaware could be responsible for the restaurant's discriminatory

acts. Burton, 365 U.S. at 725, 81 S.Ct. at 862. Following the

reasoning in Burton, we have held that actions taken by the

University of Pittsburgh and Temple University constitute state

action because the universities "receive present financial

support [and] the state has committed itself to future financial

aid and sets an annual appropriation policy and tuition rate."

Krynicky, 742 F.2d at 102.[6]

In Edmonson, the Supreme Court clarified the Lugar

joint participation test and enunciated an approach that applies

to this case. In cases such as this, courts must ask "first

whether the claimed constitutional deprivation resulted from the

---

[6]. The Supreme Court, interpreting the symbiotic relationship
test, has commented that "while 'a multitude of relationships
might appear to some to fall within the Amendment's embrace,'
differences in facts beget differences in law, limiting the
actual holding [of] Burton to lessees of public property."
Jackson, 419 U.S. at 358, 95 S.Ct. at 457 (citation omitted). At
least one court has held that this language "limited the
symbiotic relationship analysis." Haavistola, 6 F.3d at 215.
We, however, have held that the Burton test remains a viable
framework for assessing state actor status. See Krynicky v.
University of Pittsburgh, 742 F.2d at 100-01; McKeesport Hospital
ACGME, 24 F.3d at 526 n.1 (Becker, J., concurring in judgment).

exercise of a right or privilege having its source in state authority; and second, whether the private party charged with the deprivation could be described in all fairness as a state actor." Edmonson, 500 U.S. at 620, 111 S.Ct. at 2082-83 (emphasis added) (internal citations omitted).  In describing the second prong of the test, the Court explained as follows:

> Our precedents establish that, in determining whether a particular action or course of conduct is governmental in character, it is relevant to examine the following:  the extent to which the actor relies on governmental assistance and benefits, see Tulsa Professional Collection Services, Inc. v. Pope, 485 U.S. 478, 108 S.Ct. 1340 (1988); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856 (1961); whether the actor is performing a traditional governmental function, see Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809 (1953); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276 (1946); cf. San Francisco Arts & Athletics, Inc. v. United States Olympic Committee, 483 U.S. 522, 544-45, 107 S.Ct. 2971, 2985-86 (1987); and whether the injury caused is aggravated in a unique way by the incidents of governmental authority, see Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836 (1948).

Edmonson, 500 U.S. at 621-22, 111 S.Ct. at 2083.[7]

Edmonson itself involved the question of whether peremptory challenges removing jurors in civil cases constituted

---

[7]. Edmonson inquires into whether the practice involved a "traditional public function" rather than an exclusive governmental function.  While, as Justice O'Connor pointed out in her dissenting opinion, the majority might have altered the traditional public function test as a discrete test, the Edmonson majority can be read to say that in conducting the joint participation discrete test, whether the private actor performed a traditional public function is one factor to consider.  But see Judge Greenberg's concurrence.

state action under the Fifth Amendment Due Process Clause.  After weighing the relevant factors, the Court concluded (1) this was a situation in which "private parties make extensive use of state procedures with the 'overt, significant assistance of state officials.'"  Id. at 622, 111 S.Ct. at 2084 (quoting Tulsa Professional Collection Serv., Inc. v. Pope, 485 U.S. 478, 486, 108 S.Ct. 1340, 1345 (1988)); (2) peremptory challenges involve "[a] traditional function of government."  Edmonson, 500 U.S. at 624, 111 S.Ct. at 2085; (3) allowing race discrimination to proceed with impunity in a courtroom "mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality."  Edmonson, id. at 628, 111 S.Ct. at 2087.  Thus, the plaintiff's allegation that peremptory challenges were discriminatory could properly be considered under the Constitution.

We now consider whether Enterprise fairly can be found to be a state actor.  Courts addressing the status of volunteer fire companies in other jurisdictions have reached differing results.  See, e.g., Goldstein v. Chestnut Ridge Volunteer Fire Co., 25 F.3d 1039 (table), 1994 WL 233356 (4th Cir. 1994) (question of whether fire fighting is traditionally exclusive government function in Maryland is question of fact); Haavistola, 6 F.3d at 218 (same); Yeager, 980 F.2d at 340-43 (volunteer fire company in Texas not state actor); Janusaitis v. Middlebury Volunteer Fire Dep't, 607 F.2d 17, 23 (2d Cir. 1979) (volunteer fire department in Connecticut state actor); Versarge v. Township of Clinton, No. 90-257, 1991 WL 247611 at *4 (D.N.J. Nov. 18,

1991) (act of expelling member from New Jersey volunteer fire company considered state action), aff'd on other grounds, 984 F.2d 1359 (3d Cir. 1993); Kronmuller v. West End Fire Co., 123 F.R.D. 170, 174 (E.D. Pa. 1988) (disputed issues of fact existed about whether volunteer fire company was state actor); Libin v. Town of Greenwich, 625 F. Supp. 393, 397 (D. Conn. 1985) (For establishment clause purposes, "[t]he near 'symbiotic relationship' between the Town and the Company requires the conclusion that the Company is, in fact, a state actor."). Of course, since the question must be resolved by reference to the particular local facts, by definition none of these cases is controlling.

As noted above, the first question under Edmonson is whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority. This prong of the test "only asks whether the private actor who caused the harm to another person was acting in conformity with the law of the jurisdiction when he caused the harm." Rotunda & Nowak, § 16.1 at 527. In other words, we ask, under what authority did the private person engage in the allegedly unlawful acts. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965 (1972), provides a good illustration of how this first prong of the inquiry is applied. In that case, a black plaintiff sued the Moose Lodge, a private fraternal organization, alleging that the Lodge's refusal to serve him alcoholic beverages violated his right to be free from racial discrimination under the Constitution. The plaintiff "claimed

that because the Pennsylvania liquor board had issued . . . Moose Lodge a private club license that authorized the sale of alcoholic beverages on its premises, the refusal of service to him was 'state action' for purposes of the Equal Protection Clause of the Fourteenth Amendment." Id. at 165, 92 S.Ct. at 1967. The Court reasoned that because "the Pennsylvania Liquor Control Board plays absolutely no part in establishing or enforcing the membership or guest policies of the club that it licenses to serve liquor," id. at 175, 92 S.Ct. at 1972-73, there was no relationship between the relevant state policy and the discrimination. Thus, the plaintiff failed to satisfy the first prong of the test.

Here, however, the allegation of an unconstitutional deprivation is related directly to the Borough's agreement with Enterprise that the latter would be the official provider of fire services in the Borough. Pennsylvania law authorizes boroughs "[t]o make regulations, within the borough, or within such limits thereof as may be deemed proper, relative to the cause and management of fires and the prevention thereof." Pa. Stat. Ann. tit. 53, § 46202(21). Pursuant to this provision, on September 28, 1987, the Borough entered into an agreement with Enterprise under which "[Enterprise] shall provide fire suppression and fire protection within the corporate limits of the Borough" and pursuant to which "[t]he [fire] chief shall be charged with the responsibility of providing fire suppression and fire protection and appropriate emergency assistance in accordance with [Enterprise's] training and expertise as required within the

corporate limits of the Borough." Agreement by Enterprise Fire Company to Provide Fire Protection for the Borough of Hatboro (hereinafter "Agreement"), at app. 169, 170. Thus, the first prong of the test is satisfied.

The second question under Edmonson requires us to decide whether, all things considered, it is fair to hold that Enterprise is engaged in state action. As noted above, one factor we consider is the extent to which the provision of fire services is a traditional public function in Pennsylvania. In Jackson, the Supreme Court equated the question of whether something is a public function with the question of whether the particular state imposed a duty to perform the relevant function. Jackson, 419 U.S. 353, 95 S.Ct. at 454. In that case, the Court refused to hold that providing utility services is state action under the public function test, because "while the Pennsylvania statute imposes an obligation to furnish service on regulated utilities it imposes no such obligation on the State. The Pennsylvania courts have rejected the contention that furnishing of utility services is either a state function or a municipal duty." Id. at 353, 95 S.Ct. at 454. The question of whether there is a municipal duty to provide the services, and thus, whether fire protection is a governmental function, must be answered in light of "the history, tradition and local law surrounding volunteer fire departments." Yeager v. City of McGregor, 980 F.2d at 340.

We conclude that in Pennsylvania, the provision of fire protection is a governmental function. Pennsylvania courts

repeatedly have recognized, notwithstanding the permissive language of the authorizing statute quoted above, Pa. Stat. Ann. tit. 53, § 46202(21), that volunteer fire companies are engaged in a public function and that municipalities have a public duty to provide fire protection.  The Supreme Court of Pennsylvania long ago said that "[t]he protection of the city from fire is a municipal function of the highest importance."  Commonwealth v. Barker, 61 A. 253, 254 (Pa. 1905).  In another case, the Court opined that volunteer firemen are analogous to police officers, and that volunteer fire companies were entitled to governmental immunity:

> It has been held in this state that the duty of extinguishing fires, and saving property thereupon is a public duty, and the agent to whom such authority is delegated is a public agent, and not liable for the negligence of its employees. . . . The same reason which exempts the city from liability for the acts of its policemen, applies with equal force to the acts of the firemen.  And it would seem from this and other cases to make no difference, as respects to the legal liability, whether the organization performing such public service is a volunteer or not.

Fire Ins. Patrol v. Boyd, 15 A. 553, 556-57 (Pa. 1888) (emphasis added).  Relying on these cases, the Commonwealth Court of Pennsylvania more recently concluded that "volunteer fire companies, because of their distinct creation and present relationship to municipalities, presently enjoy governmental immunity."  Zern v. Muldoon, 516 A.2d 799, 805 (Pa. Commw. Ct.

1986) (emphasis added), <u>appeal dismissed</u>, 541 A.2d 314 (Pa. 1988)).  The court reasoned:

> This conclusion is supported by a recognition that the functions and accomplishments of volunteer fire departments affix to their continued existence a public, <u>governmental</u> character.  The extensive statutory legislation which enhances and directs the organization of volunteer fire companies demonstrates an adoption by the Commonwealth and its citizenry of the governmental characteristic of volunteer fire companies. The charitable emphasis [of older cases] has been replaced by the critical realization of the need for continued public protection from fire and the realization that a governmental duty can be capably performed by mostly volunteer organizations.

<u>Zern</u>, 516 A.2d at 805.  Even more recently, the Supreme Court of Pennsylvania, interpreting a Pennsylvania statute providing governmental immunity to governmental agencies, held that a volunteer fire company is a local agency entitled to governmental immunity under 42 Pa. Cons. Stat. Ann. § 8541 (1982), and that "governmental immunity [applies] even when they are not engaged in fire-fighting activities."  <u>Guinn v. Alburtis Fire Co.</u>, 614 A.2d 218, 219, 220 (Pa. 1992).[8]

Enterprise argues that <u>Guinn</u> is inapplicable because a holding that an entity is a governmental agency entitled to governmental immunity under a local law is fundamentally distinct

---

[8].  <u>Guinn's</u> holding has been interpreted to apply only to fire companies that "(1) have been created pursuant to relevant law and (2) that are legally recognized as the official fire company for a political subdivision."  <u>Kniaz v. Benton Borough</u>, 642 A.2d 551, 554 (Pa. Commw. Ct. 1994).  In this case there is no question that both of these requirements have been met.

from a holding that a party is a state actor under section 1983. Indeed, in Krynicky, we noted the distinction between government agency status under state law and state actor status under section 1983. Krynicky, 742 F.2d at 103 n.12. But whether an entity is a state agency may, in certain cases, be relevant in determining whether it is a state actor for section 1983 purposes. Here, the rationale behind Guinn and the other cases discussed above was that in Pennsylvania firefighting is a public duty and a public function. Thus, Guinn is certainly relevant to our analysis.[9]

Moreover, an analysis of Pennsylvania courts' treatment of volunteer fire companies in other situations leads inevitably to the conclusion that volunteer fire companies in Pennsylvania are state actors. In Harmony Volunteer Fire Co. and Relief Ass'n v. Commonwealth of Pennsylvania, 459 A.2d 439 (Pa. Commw. Ct. 1983), the Commonwealth Court of Pennsylvania discussed whether a volunteer fire company is an employer under Pennsylvania's Human Relations Act, Pa. Stat. Ann. tit. 43 §, 954(b) (1991). In the course of its decision, the court discussed Janusaitis v. Middlebury Volunteer Fire Dep't, 464 F. Supp. 288 (D. Conn. 1979)

---

[9]. In Krynicky, we opined that "a state court construction of a state statute has no bearing on whether an entity that is connected with the state is a 'state actor' for purposes of the fourteenth amendment and § 1983." 742 F.2d at 103 n.12. While it is certainly true that a state court's determination that an actor is private cannot bind a federal court's determination of whether the action is nonetheless public, a state's converse finding certainly has more weight.

(Janusaitis I), and Janusaitis v. Middlebury Volunteer Fire

Dep't, 607 F.2d 17 (2d Cir. 1979) (Janusaitis II), two opinions

addressing whether a volunteer fire company is a state actor

under section 1983.  In Janusaitis, the district court found that

the company was not a state actor, but the court of appeals

disagreed.  The Harmony court noted that "many of the

considerations involved in the present case are also a part of a

state action determination," see Harmony Volunteer Fire Co., 459

A.2d at 442-43, and rejected the reasoning of Janusaitis I.

Instead, it quoted the court of appeals' statement that "[f]ire

protection is a function public or governmental in nature . . .

which would have to be performed by the Government but for the

activities of volunteer fire departments."  Id. at 443 (quoting

Janusaitis II, 607 F.2d at 24).  The Harmony court continued: "We

concur with that statement and with the position of the

commission that the fire company's primary function, the

provision of fire and emergency services, is governmental in

nature."  Harmony Volunteer Fire Co., 459 A.2d at 443.

Our conclusion is reinforced further by a Pennsylvania

appellate court's determination that a volunteer fire department

may be held liable under section 1983 for violating a plaintiff's

constitutional rights.  In that case, Tallon v. Liberty Hose Co.

No. 1, 485 A.2d 1209 (Pa. Super. Ct. 1984), the plaintiff alleged

that a volunteer fire company "had denied her application for

membership solely on the basis of her sex," id. at 1211, and

claimed relief under section 1983 and the Fourteenth Amendment.

After the parties entered into a consent decree, the plaintiff

moved for attorney fees pursuant to 42 U.S.C. § 1988.[10]  Upon finding that the company was unable to pay, the trial court declined to award fees.  The Superior Court reversed, holding that "an award of fees cannot be denied on the basis of appellee's perceived inability to pay," and remanded the matter for a determination of the proper amount of fees to be awarded. Id. at 1214.

Under section 1988, in a section 1983 case a plaintiff may receive an award of attorneys fees only if a prevailing party, and the Tallon court noted that "we agree[] that appellant met the requirements of the Act in that she was the prevailing party in a section 1983 cause of action."  Id. at 1212.  In order to prevail in a section 1983 cause of action, a party must establish that the defendant acted under color of state law, or was a state actor.  Therefore, in holding that the court could award attorneys fees, the Superior Court necessarily believed that the volunteer fire company was a state actor under section 1983.  Otherwise, it could not have awarded fees.

Importantly, our conclusion cannot be avoided by the fact that Tallon involved interpretation of a consent decree,

_____

[10].  This statute provides in pertinent part that:

> In any action or proceeding to enforce a
> provision of section[] . . . 1983 . . . the
> court, in its discretion, may allow the
> prevailing party, other than the United
> States, a reasonable attorney's fee as part
> of the costs.

42 U.S.C. § 1988(b).

because in that decree the defendant expressly contended that it violated no federal law.  See Tallon, 485 A.2d at 1211 (In the consent decree, "Liberty Hose made no admission that it had violated federal law."); id. at 1212 n.3 ("Appellee avers that appellant's claim against appellee did not involve any right guaranteed by the Constitution or laws of the United States and therefore she cannot recover counsel fees under 42 U.S.C. § 1988.").  The court nonetheless found "this argument to be meritless."  Id.

Tallon is particularly significant because there, as here, the volunteer fire company operated with much autonomy. The consent decree provided that:

> [A]ppellant would be admitted as a probationary member of the hose company, and if she fulfilled the probationary requirements, which applied to all members, she would be admitted as a permanent member. The consent decree further stated that the constitution and by-laws of the hose company would be amended to specify that no person would be rejected from membership on the basis of gender.

Id. at 1211.  In other words, the company had its own by-laws, its own constitution, and the authority to adopt its own policies and regulations.  The case at hand is indistinguishable from that case.  We therefore hold that as Enterprise, in accordance with its agreement with the Borough, is "the duly appointed Fire Company to service the Borough" and under applicable state law is performing an exclusively governmental function.[11]

---

[11].  The district court also relied on several treatises for the proposition that firefighting generally, and in Pennsylvania in

Because Pennsylvania courts view firefighting as a public duty and treat volunteer fire companies for all relevant purposes as state entities, and because Enterprise is the duly appointed fire company of the Borough, we probably could end our analysis here. We nonetheless continue to consider factors relevant to the question of whether Enterprise is engaged in state action. We thus look at the extent to which Enterprise relies on governmental assistance and benefits, see Edmonson, and the extent of the nexus between the state and the volunteer fire company. McKeesport Hospital, 24 F.2d at 526 (Becker, J.

(..continued)
particular, historically has been the province of private actors. For instance, it states that "[i]n 1986, only 49 of the Commonwealth's 2,550 fire departments were paid or partially paid units. The remaining 2,501 were all-volunteer fire companies." Mark, 856 F. Supp. at 973 (citing John Clements, Pennsylvania Facts at 23 (1987)). In the first place, this fact does not answer the question of whether these private companies are performing a traditional governmental function, or whether a fire company duly appointed by a municipality is essentially an arm of the municipality. Second, Pennsylvania courts' treatment of the issue is more significant than a single fact.

We are also aware that in Yeager, the court relied on several treatises and newspaper articles for the proposition that "there are a variety of private sector fire fighting alternatives; and fire fighting is not generally an exclusive government function." Yeager, 980 F.2d at 341. The problem with this analysis is threefold. First, the Yeager court was supposed to be inquiring into the history of the particular municipality, not the general history of volunteer firefighting. Second, the existence of private volunteer firefighting companies says nothing about whether the State or the municipality has a public duty to provide firefighting. Finally, the Yeager court improperly applied the "exclusive public function" test. When the question is whether the state can delegate a responsibility and thereby avoid the strictures of the Fourteenth Amendment, it is illogical to view the delegation of that very responsibility as evidence that the responsibility can be delegated.

concurring in judgment).  We also consider the degree to which the State has "exercised coercive power or has provided . . . significant encouragement, either overt or covert."  Blum, 457 U.S. at 1004, 102 S.Ct. at 2786.

"[T]he history, structure, organization and public duty of volunteer fire companies distinguish them from any other organization in existence in this Commonwealth today."  Temple v. Milmont Fire Co., 525 A.2d 848, 851 (Pa. Commw. Ct. 1987), appeal denied, 533 A.2d 95 (Pa. 1987); Scrima v. Swissvale Area Emergency Serv., 599 A.2d 301, 303 (Pa. Commw. Ct. 1991) (distinguishing volunteer fire companies from volunteer ambulance associations, which only "provide an important service to the community").  One court has explained the intertwining of the state and volunteer fire companies in detail:

> Numerous legislative enactments . . . interweave the functioning of the government and the fire company.  Several statutes provide the fire company with particular benefits and powers:  volunteer firefighters may become special fire police with full power to regulate traffic, control crowds and exercise all other police powers necessary to facilitate the fire company's work at a fire or any other emergency; volunteer fire associations are exempt from vehicle title and registration fees; and fire companies are eligible for low interest state loans in order to purchase equipment.  Other statutes also recognize the intimate relationship between a volunteer fire company and governmental entities:  the borough is liable for the negligent operation of equipment by a volunteer firefighter responding to an emergency; an employer may not terminate a volunteer firefighter for missing work while responding to a fire call; firefighters are government employees under the workmen's compensation act; firefighter relief

> associations are entitled to receive a two
> percent tax on all foreign fire insurance
> premiums; the borough may make regulations
> for fire safety and may make appropriations
> to fire companies; the state may regulate
> relief companies; and the fire station is
> exempt from property taxes.

Harmony Volunteer Fire Co., 459 A.2d at 443.  Moreover,
Pennsylvania law prohibits municipalities from replacing
volunteer fire companies by paid companies "except by a majority
vote in a local referendum."  Temple, 525 A.2d at 851–52.  Its
agreement with the Borough provides Enterprise with still more
financial benefits.  Under it, "[t]he Borough agrees to provide
[Enterprise] sufficient funds for its operation and capital
expenditures by the imposition of a fire tax."  Agreement at app.
169.  By using funds obtained by the fire tax, the Borough may
purchase equipment or property for Enterprise, and Enterprise
will keep its equipment and facilities in good repair.  Id. at
170–71.  Further still, the Borough agrees to "maintain insurance
for [Enterprise] as regards to personal injury or property damage
from its general operating funds."  Id. at 171.

In exchange for taking over the municipality's public
duty, Enterprise is designated as the "duly appointed Fire
Company to service the Borough of Hatboro."  Agreement at app.
170.  Enterprise must "prepare and submit an annual budget to
Borough Council," which the Borough Council then decides whether
or not to approve.  The agreement further requires the Fire Chief
to attend meetings of the Borough Council and to "[p]rovide a
written report to Borough Council at the first regular council or

committee meeting of each calendar month as to the Company's current status relating to operations within the Borough."  And, directly pertinent to Mark's allegations of insufficient screening and training, "[t]he fire chief and president of [Enterprise] shall . . . [a]ssure that the operation of [Enterprise's] personnel and equipment meets satisfactory standards for fire prevention and control."  Agreement at app. 172.  Finally, we note that the individual act alleged to be wrongful -- the method of electing firefighters -- is directly related to the state-created duty to provide fire protection in the first place.  See Blum, 457 U.S. at 1007-08 & n.17, 102 S.Ct. at 2787 & n.17.

It is apparent, then, that the Borough and Enterprise are intertwined to a great extent, that Enterprise depends in large part on the municipality for funding, and that through the granting of benefits and the appointing of Enterprise as a "duly appointed fire company," the Borough actively encourages it to perform a municipal duty.  In the circumstances, we hold that Enterprise is a state actor for purposes of this case.

### B.  Was Mark deprived of a constitutional right?

The fact that Enterprise is a state actor does not end our inquiry.  In order to prove a section 1983 claim, a plaintiff must show that he or she was deprived of a constitutional right. Mark bases his theory of liability against both defendants on Monell v. Dep't of Social Servs., 436 U.S. 658, 98 S.Ct. 2018 (1978), and later cases building on Monell, holding that a

municipal entity may be liable when its policymakers made a deliberate choice from among various alternatives to follow a particular course of action, where the policy reflected deliberate indifference to the constitutional rights of the municipality's inhabitants, and where the policy was the moving force behind a constitutional violation. Mark further predicates his claim that there was a constitutional violation on the "state created danger theory," which, in turn, derives from language used in the Supreme Court opinion of DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 109 S.Ct. 998 (1989). The defendants contend that under several cases decided after Monell, including DeShaney, Mark's claim must be dismissed.

In Monell, the Supreme Court held that "when execution of a government's policy or custom, whether by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury then the government as an entity is responsible under § 1983." 436 U.S. at 694, 98 S.Ct. at 2037–38. Post-Monell cases often have reflected confusion with the actual standard governing the imposition of liability, but two subsequent Supreme Court cases have delineated those situations more clearly. In City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204 (1989), the Court held that "the inadequacy of police training may serve as the basis for § 1983 liability . . . where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." In that case, however, the Court "assume[d] that respondent's constitutional right . . . was denied by city

employees," id. at 389 n.8, 109 S.Ct. 1205 n.8, and went on to assess whether the failure to train ever could give rise to municipal responsibility. Thus, the case cannot be read to stand for the proposition that a policy evincing willful disregard, though not causing a constitutional violation, can be the basis for section 1983 liability. In short, City of Canton dealt with responsibility for an assumed constitutional violation.

In Collins v. City of Harker Heights, 503 U.S. 115, 112 S.Ct. 1061 (1992), the Court clarified still further the issue of when a municipality may be liable. In that case, the plaintiff's decedent, a city employee, died of asphyxia after entering a manhole. The plaintiff claimed that her decedent "had a constitutional right to be free from unreasonable risks of harm to his body, mind and emotions and a constitutional right to be protected from the City of Harker Heights' custom and policy of deliberate indifference toward the safety of its employees." Id. at ____, 112 S.Ct. at 1064. The Court this time assumed that the municipality was responsible for the injury and asked whether the injury was of constitutional proportions. Thus, it reversed its focus from that in City of Canton. In so doing, it inquired into: (1) whether "the Due Process Clause supports petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause," id. at ____, 112 S.Ct. at 1069; and (2) whether "the city's alleged failure to train its employees, or to warn them about known risks of harm, was an omission that can properly be characterized as arbitrary, or

conscience-shocking, in a constitutional sense." Id. at ____, 112 S.Ct. at 1070. Reasoning that there was no affirmative constitutional duty, and that the city's actions were not conscience-shocking or arbitrary, a unanimous Court held that there could be no section 1983 liability. It did not matter whether a policy enacted with deliberate indifference to city employees caused the injury, because the injury could not be characterized as constitutional in scope.

Thus, Collins made clear that in a Monell case, the "proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and if so, (2) whether the city is responsible for that violation." Id. at ____, 112 S.Ct. at 1066; see also Searles v. Southeastern Pa. Transp. Auth., 990 F.2d 789, 791 (3d Cir. 1993) (quoting Collins).

Against this backdrop, we first address whether Mark can demonstrate that a constitutional injury was inflicted upon him. He claims that the defendants directly caused the harm by creating the danger; in other words, he argues that "by cloaking Marley with state authority to set fires, Defendants prompted him to set fires he otherwise would not have set." Reply Br. at 4 (citing Complaint). The defendants respond by characterizing the alleged constitutional violation as a failure to protect Mark from the risk of arson committed by private citizens. They then argue that Collins and DeShaney foreclose Mark's theory of constitutional injury. We turn to DeShaney now.

In the Supreme Court's own words, the facts of DeShaney were "undeniably tragic":  Although a Winnebago County Department of Social Services caseworker knew of a number of suspicious injuries to Joshua DeShaney, which strongly indicated that a member of the child's household was severely physically abusing him, the caseworker nonetheless took no action to protect the child.  Soon thereafter, the child's father "beat 4-year-old Joshua so severely that he fell into a life-threatening coma [after which] he suffered brain damage so severe that he is expected to spend the rest of his life confined to an institution for the profoundly retarded."  DeShaney, 489 U.S. at 193, 109 S.Ct. at 1001-02.  Nevertheless the Court unequivocally held that states generally are under no affirmative duty to protect citizens from torts committed by private individuals.  The Court explained:

> The [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.  It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

DeShaney, id. at 195, 109 S.Ct. at 1003.  The Court held that no constitutional right had been violated because, absent a special relationship, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  DeShaney, id. at 197, 109 S.Ct. at 1004.  There is a special relationship only in those limited

circumstances where the plaintiff is essentially in the defendant's custody. Thus, the Due Process Clause "requires the State to provide adequate medical care to incarcerated prisoners," who are unable to procure such care for themselves. DeShaney, id. at 198, 109 S.Ct. at 1005 (citing Estelle v. Gamble, 429 U.S. 97, 103-04, 97 S.Ct. 285, 290-91 (1976)). Similarly, states must "provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others." Id. at 199, 109 S.Ct. at 1005 (citing Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452 (1982)). See also Collins (state had no constitutional duty to protect employee from foreseeable risks at work); Searles v. Southeastern Pa. Transp. Auth., 990 F.2d at 792 (the Constitution "'[does not] impose[] a duty on SEPTA [, a passenger train line,] to provide a safe passenger environment.'" (quoting Searles v. Southeastern Pa. Transp. Auth., Civil Action Nos. 91-6687 & 92-1065, 1992 WL 150701, at *4 (E.D. Pa. June 19, 1992)).

As a preliminary matter, we reject Mark's attempt to distinguish DeShaney by contending that Marley was a state actor when he committed the arson. Marley, the underlying active tortfeasor, acted in a purely private capacity when he committed the arson. It is well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state. Rather, in order for the tortfeasor to be acting under color of state law, his act must entail "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state

law." United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043 (1941); Barna v. City of Perth Amboy, 42 F.3d 809, 815–16 (3d Cir. 1994). "[U]nder color of law means under 'pretense' of law. Thus, acts of officers in the ambit of their personal pursuits are plainly excluded. Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it." Screws v. United States, 325 U.S. 91, 111, 65 S.Ct. 1031, 1040 (1945) (plurality opinion). See Barna, 42 F.3d at 815–16; Navarro v. Otero de Ramos, 797 F. Supp. 87, 90 (D.P.R. 1992). But even "acts committed by a police officer . . . while on duty and in uniform are not under color of state law unless they are in some way 'related to the performance of police duties.'" Briscoe v. LaHue, 663 F.2d 713, 721 n.4. (7th Cir. 1981) (quoting Johnson v. Hackett, 284 F. Supp. 933, 937 (E.D. Pa. 1968)), aff'd, 460 U.S. 325, 103 S.Ct. 1108 (1983). As the Court of Appeals for the Second Circuit has explained, if a person's actions "were not 'committed in the performance of any actual or pretended duty,'" the actions were not committed under color of law. Bonsignore v. City of New York, 683 F.2d 635, 639 (2d Cir. 1982) (quoting Johnson v. Hackett, 284 F. Supp. at 937). See, generally, Barna 42 F.3d at 815–17.

On this point, this case is not even close, unlike, for example, cases in which police officers moonlight as security guards and dress in their police uniforms. See D.T. by M.T. v. Independent Sch. Dist. No. 16, 894 F.2d 1176, 1190–91 (10th Cir. 1990) (collecting cases), cert. denied, 498 U.S. 879, 111 S.Ct.

213 (1990). Marley set a fire when his obligation was to put out fires. He apparently did it secretly, giving no one the impression that he was acting on behalf of Enterprise. While Mark contends that Marley lit the fire so that he could put it out, he points to no evidence in the record directly supporting that proposition. Moreover, even if the allegation is true, it is not relevant in the circumstances here, as Mark does not contend that the officers or indeed anyone else from Enterprise knew that Marley intended to start the fire. Marley clearly was pursuing his own goals and was not in any way subject to control by Enterprise when he started the fire. Furthermore, it would be bizarre to hold that inasmuch as Enterprise was in the "business" of putting out fires, Marley furthered Enterprise's functions by providing it with an opportunity to fight a fire. In this case the defendants did not abuse their authority and Marley was a private actor when he caused the harm. Thus, DeShaney certainly applies, and the question becomes whether that case leaves open the possibility of state liability when private actors commit the underlying tort.

In this regard, it is important to recognize that in DeShaney, the "Court's baseline [was] the absence of positive rights in the Constitution and a concomitant suspicion of any claim that seems to depend on such rights." DeShaney, 489 U.S. at 204, 109 S.Ct. at 1008 (Brennan, J., dissenting). And when the Court characterized "the DeShaneys' claim [as being] first and foremost about inaction (the failure, here, of respondents to take steps to protect Joshua)," id. (Brennan, J., dissenting),

the result became clear.  Thus, the proposition that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," id. at 197, 109 S.Ct. at 1004, does not necessarily preclude liability where the harm -- though at the hands of a private actor -- is the product of state action that legitimately can be characterized as affirmative conduct.  Indeed, the DeShaney Court explicitly noted that under the facts of that case, "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."  DeShaney, id. at 201, 109 S.Ct. at 1006.

Several courts have interpreted this language to mean that "[w]hen state actors knowingly place a person in danger, the due process clause of the constitution . . . render[s] them accountable for the foreseeable injuries that result from their conduct".  Johnson v. Dallas Independent Sch. Dist., 38 F.3d 198, 199 (5th Cir. 1994); Bowers v. De Vito, 686 F.2d 616, 618 (7th Cir. 1982) ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into the snake pit.").

For our part, we have yet to decide definitively whether the state-created danger theory is a viable mechanism for finding a constitutional injury.  In D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364 (3d Cir. 1992) (in banc), cert. denied, ___ U.S. ___, 113 S.Ct. 1045 (1993), while we

analyzed the plaintiffs' claims under the state-created danger theory, we consistently referred to the claim as "plaintiffs' theory," only going so far as to acknowledge that other courts have recognized the theory.  See D.R., 972 F.2d at 1373 ("Plaintiffs' counsel asserts that this [state created danger] claim exists apart from the claim based on the compulsory attendance law."); id. at 1375 ("We now turn to the final two cases cited by plaintiffs to support their theory of state-created danger.") (emphasis added).  Similarly, in Brown v. Grabowski, 922 F.2d 1097, 1114-16 (3d Cir. 1990), cert. denied, 501 U.S. 1218, 111 S.Ct. 2827 (1991), we acknowledged that other courts of appeals had applied the state created danger theory, but we simply distinguished those cases on the facts.  Finally, after noting in Searles v. Southeastern Pa. Trans. Auth. plaintiff's argument that "the injury [was] directly caused by a state actor's affirmative act in the traditional sense," we quickly concluded that, even assuming the viability of the theory, the facts of the case did not fall within its purview. Searles, 990 F.2d at 793.

        After undertaking a thorough review of our caselaw touching upon the underlying constitutional violation in a Monell/Collins case, we have found language in the cases supporting and opposing the existence of a state-created danger theory.  Perhaps at some point we will have to harmonize our cases.  But we have not reached that day, because even assuming that a plaintiff can state a constitutional violation based on

the state-created danger theory, there can be no liability in this case.

The Court of Appeals for the Fifth Circuit recently concluded that in order to prove liability under the state created danger theory, "the environment created by the state actors must be dangerous; they must know it to be dangerous; and . . . they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur. Put otherwise, the defendants must have been at least deliberately indifferent to the plight of the plaintiff." Johnson v. Dallas Indep. Sch. Dist., 38 F.3d at 201.[12]

Our review of the cases supports these observations. For instance, in Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989), cert. denied, 498 U.S. 938, 111 S.Ct. 341 (1990), a state trooper, after arresting the driver of a car and impounding the car, left the driver's female passenger stranded alone in a neighborhood with the highest aggravated crime rate in the county at 2:30 A.M. The plaintiff was raped. The court held that the plaintiff "has raised a genuine issue of fact tending to show that [the trooper] acted with deliberate indifference to [plaintiff's] interest in personal security under the fourteenth amendment." Id. at 588. In Cornelius v. Town of Highland Lake, 880 F.2d 348 (11th Cir. 1989), cert. denied, 494 U.S. 1066, 110

---

[12]. In that case, the Court of Appeals declined to decide whether such a theory is viable.

S.Ct. 1784 (1990), the state allowed a prisoner with a history of committing violent crimes to participate in a work release program where he had access to "axes, picks, machetes, knives and saws," and was supervised only by an unarmed civilian member of the community. The inmate abducted the town clerk at knife point and held her hostage for three days, during which time he threatened to abuse her sexually and physically and to kill her. Id. at 350.

Cases like these have four things in common: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur. Thus, in Brown v. Grabowski we pointed out that in Wood, the plaintiff and state actors had "more than fleeting and merely prefatory . . . contact." Brown, 922 F.2d at 1116. Similarly, Brown noted that "[i]n Cornelius, the plaintiff introduced evidence that the defendants who employed her exercised a control over her work environment that arguably was sufficient to create a special, quasi-custodial relationship between them." Brown, 922 F.2d at 1115. Accordingly, in Brown we emphasized that cases applying the theory focused on the fact that a relationship existed between the state and the plaintiff, under which the state qua state placed the plaintiff in danger of a foreseeable injury.

The cases where the state-created danger theory was applied were based on discrete, grossly reckless acts committed by the state or state actors using their peculiar positions as state actors, leaving a discrete plaintiff vulnerable to foreseeable injury.  In Wood, for example, the woman eventually was raped, and the court held that a jury could find that the officer, using his power as an officer, placed the plaintiff in a situation entailing a foreseeable risk of danger.  Indeed, assuming the facts are true, it would be unfair to say that the state actor was not responsible for the rape.

But this case is not like those cases at all.  When the alleged unlawful act is a policy directed at the public at large -- namely a failure to protect the public by failing adequately to screen applicants for membership in a volunteer fire company -- the rationale behind the rule disappears -- there can be no specific knowledge by the defendant of the particular plaintiff's condition, and there is no relationship between the defendant and the plaintiff.  Therefore, we cannot say that an oppressive act of the defendants, made possible by virtue of the fact that they were acting in a public capacity, caused Mark's injury.[13]

---

[13]. Nor, for the reasons discussed above, and discussed below in our "deliberate indifference" section, can we say that Enterprise's and the Borough's actions in failing psychologically to screen applicants shocks the conscience and therefore that the policy itself caused the harm.  In this regard, we note that there is some inconsistency in our circuit as to the standard governing the underlying constitutional violation in policy, custom or practice cases.  Collins, in assessing whether the plaintiff had established a constitutional violation predicate to municipal liability, asked first whether she had established a duty, and second whether the defendant's actions shocked the conscience.  In Fagan v. City of Vineland, 22

We conclude, therefore, that Mark has failed to demonstrate that he was deprived of a constitutional right. Consequently, neither Enterprise nor the Borough can be liable in this case.

### C. Were defendants deliberately indifferent?

(..continued)
F.3d 1296 (3d Cir. 1994) (in banc), we interpreted Collins to mean that in all substantive due process cases, the appropriate constitutional test is whether the defendant's actions shock the conscience. But in Fagan v. City of Vineland, 22 F.3d 1283 (3d Cir. 1994) (panel opinion), in articulating the constitutional standard for municipal liability, we said:

> [I]n a substantive due process case arising out of a police pursuit, an underlying constitutional tort can still exist even if no individual police officer violated the Constitution. . . . The pursuing police officers are liable under section 1983 if their conduct 'shocks the conscience.' The City is liable under section 1983 if its policymakers, acting with deliberate indifference, implemented a policy of inadequate training and thereby caused the officers to conduct the pursuit in an unsafe manner and deprive the plaintiffs of life or liberty.

Id. at 1292 (emphasis added) (citation omitted). Therefore, the Fagan panel opinion appeared to hold that a plaintiff can establish a constitutional violation predicate to a claim of municipal liability simply by demonstrating that the policymakers, acting with deliberate indifference, enacted an inadequate policy that caused an injury. It appears that, by focusing almost exclusively on the "deliberate indifference" prong of the Collins test, the panel opinion did not apply the first prong -- establishing an underlying constitutional violation. At any rate, as discussed in detail in the text, we believe that the defendants' actions and omissions not only fail to shock the conscience, but cannot be characterized as deliberately indifferent.

Notwithstanding our foregoing conclusion, we will assume that Mark was deprived of a constitutional right. Nevertheless, we conclude that the defendants cannot be responsible for his losses even though Mark asserts that they were deliberately indifferent in failing to establish and impose prudent membership screening requirements.  In City of Canton v. Harris, the Court discussed the meaning of the deliberate indifference standard:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.  But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

489 U.S. at 390, 109 S.Ct. at 1205.  As an example, the Court noted that it may be obvious that when the city has armed its police officers with firearms, and the city knows the officers will be required to arrest fleeing felons, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."  Id. at n.10.

Mark's evidence that the defendants' failure to screen applicants psychologically for tendencies toward arson amounts to deliberate indifference consists of the following:  Joseph Reading of Enterprise and others representing Enterprise and the Borough, testified that arsonists pose a greater danger to the community when members of fire departments, see app. 417, and that in recent years there have been a number of instances in which volunteer firemen, though not members of Enterprise, set fires.  App. 447.  Mark also includes a series of expert reports tending to show that Marley exhibited a "thrill seeking" personality and a history of alcohol and drug abuse and that therefore he should not have been made a member of the fire department.  According to Mark's evidence, Marley appeared visibly drunk at fires.  Third, Mark has attached a series of newspaper articles demonstrating the risk of volunteer firefighters committing fires.  Finally, Mark submitted a report from George E. Friedell, Deputy Chief (Retired) of the New York City Fire Department and Assistant Professor of Fire Science at City University of New York, stating that "physical and mental capabilities of applicants and members should be tested at levels commensurate with the duties of a fire fighter."  App. 993.  The report points out that "[i]t is well known that certain arsonists set fires either for the thrill of watching the fire or the thrill of participating in extinguishing the fire."  Id.  Moreover, "[i]t is well known that virtually all professional and many volunteer fire companies have adopted a policy of doing psychological testing and background investigation of applicants

and of members suspected of having problems and that, where such testing is performed, arson fires by fire fighters have been reduced essentially to zero."  Id. at 995.

But the report provides no statistical evidence that psychological testing substantially has reduced such arsons. Consequently, we are asked to take Friedell's word for it.  In any event, even if we do so, Enterprise did have a screening procedure -- the state police performed a background check on each applicant at Enterprise's expense.  And, prior to the Marley fire, Enterprise's firefighters had not committed a single arson in the past 100 years.[14]  Thus, any allegation that the need for psychological screening was "obvious" would have to measure the extent to which psychological screening provides a better benchmark for discovering potential arsonists than the police background check Enterprise already employed.  We cannot say on the record before us that psychological testing provides such a better method of screening that a failure to use it can be held to evince deliberate indifference to members of the community.

---

[14].  While a "policy which ordered or authorized an unconstitutional act can be established by a single decision by proper municipal policymakers", see Pembaur v. City of Cincinnati, 475 U.S. 469, 482 n.11, 106 S.Ct. 1292, 1300 n.11 (1986), the fact that only a single unconstitutional act is alleged can support a conclusion that the act was not caused by a policy, see id. (citing Tuttle, 471 U.S. at 823-24, 105 S.Ct. at 2436), or that the need for heightened training or screening was not obvious.  City of Canton, 489 U.S. at 390 n.10, 109 S.Ct. at 1205 n.10 ("It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need.").

In reaching our conclusions, we accept the proposition that psychological screening would tell more about a person's background than a state police background check -- including characteristics that are compatible with the characteristics of arsonists. Yet such screening in itself can lead to difficulties as it may exclude too many people and perhaps be constitutionally deficient in that way. Thus, if we held that Mark could survive the motions for summary judgment because at trial the trier of the fact might conclude that there should have been psychological screening, we effectively might be requiring volunteer fire companies to initiate a process which in other cases will expose it to liability by reason of having excluded an applicant from membership. In this regard, we point out that we have held that Enterprise is a public actor.

Moreover, an overbroad screening process, even if not leading to lawsuits by excluding applicants, could infringe on their privacy rights. In fact, Reading testified that Enterprise stopped having a background check performed by local police because "the right to privacy came in . . . ." App. 412. Cf. DeShaney, 489 U.S. at 203, 109 S.Ct. at 1007 ("In defense of [the county workers] it must also be said that had they moved too soon to take custody of the son away from the father, they would likely have been met with charges of improperly intruding into the parent-child relationship."). The totality of these circumstances establishes that the record cannot support a conclusion that Enterprise was deliberately indifferent with

respect to screening applicants.  The most that can be said is that in some persons' views there was a better way to screen.[15]

## IV.  CONCLUSION

Based on the foregoing, we conclude that (1) Enterprise is a state actor; (2) there was no underlying constitutional violation in this case for which the defendants can be held responsible; (3) even if liability could attach, it may not be imposed in this case because the defendants did not enact a policy evincing willful disregard or deliberate indifference to plaintiff's rights.  Therefore, for all the reasons detailed above, we will affirm the order for summary judgment of June 30, 1994.

---

[15].  We hasten to add that we are not holding that screening is necessary, as that issue is not before us since Enterprise did screen applicants.

**Mark v. Hatboro**, No. 94–1722

**Greenberg**, <u>Circuit</u> <u>Judge</u>, concurring.

   I write separately in this case because I believe <u>Edmonson</u> should be read to alter the interpretive landscape for all state action inquiries into whether a private actor should be considered a state actor for a particular action or course of conduct.  I believe that the discrete test approach did not survive <u>Edmonson</u>.

I.

   As the majority opinion notes, the <u>Edmonson</u> Court described the state action doctrine as follows:

> Our precedents establish that, in determining whether a particular action or course of conduct is governmental in character, it is relevant to examine the following:  the extent to which the actor relies on governmental assistance and benefits, <u>see</u> <u>Tulsa Professional Collection Services, Inc.</u> <u>v. Pope</u>, 485 U.S. 478, 108 S.Ct. 1340 (1988); <u>Burton v. Wilmington Parking Authority</u>, 365 U.S. 715, 81 S.Ct. 856 (1961); whether the actor is performing a traditional governmental function, <u>see</u> <u>Terry v. Adams</u>, 345 U.S. 461, 73 S.Ct. 809 (1953); <u>Marsh v.</u> <u>Alabama</u>, 326 U.S. 501, 66 S.Ct. 276 (1946); <u>cf.</u> <u>San Francisco Arts & Athletics, Inc. v.</u> <u>United States Olympic Committee</u>, 483 U.S. 522, 544–45, 107 S.Ct. 2971, 2985–86 (1987); and whether the injury caused is aggravated in a unique way by the incidents of governmental authority, <u>see</u> <u>Shelley v.</u> <u>Kraemer</u>, 334 U.S. 1, 68 S.Ct. 836 (1948).

<u>Edmonson v. Leesville Concrete Co.</u>, 500 U.S. 614, 621–22, 111 S.Ct. 2077, 2083 (1991).  Yet the majority concludes that this language applies only to one of the discrete state action inquiries, and assumes that the entire panoply of discrete tests

survived Edmonson.  I recognize that a number of courts have, like the district court and majority opinion in this case, continued to apply the discrete test approach.  See, e.g., United Auto Workers v. Gaston Festivals, Inc., 43 F.3d 902, 906 (4th Cir. 1995); Sherman v. Community Consolidated Sch. Dist., 8 F.3d 1160, 1168-69 (7th Cir. 1993); Haavistola v. Community Fire Co., 6 F.3d 211, 215 (4th Cir. 1993); Yeager v. City of McGregor, 980 F.2d 337, 339-40 (5th Cir.), cert. denied, ____ U.S. ____, 114 S.Ct. 79 (1993); Moore v. Wyoming Medical Center, 825 F. Supp. 1531, 1540 (D. Wyo. 1993).  And because prior precedents of this Court similarly have ruled, I wrote the majority opinion that way.  Groman v. Township of Manalapan, No. 94-5200 (3d Cir. Feb. 16, 1995).

But I believe that interpretation is wrong.  In the first place, as the Supreme Court itself has pointed out, it never has been clear "[w]hether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in [each] situation".  Lugar v. Edmondson Oil Co., 457 U.S. 922, 939, 102 S.Ct. 2744, 2755 (1982).  Thus, to say that there are no discrete tests is not saying anything new or radical.  And, as is apparent by the description and application of the various scenarios in the majority opinion, utilization of the discrete test approach has created nothing short of an analytical muddle.  For one thing, the discrete tests collapse

into each other and overlap significantly. See 2 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 16.4 at 554-55 (2d ed. 1992). Moreover, "[u]nfortunately, [the Supreme Court] cases deciding when private action might be deemed that of the state have not been a model of consistency." Edmonson, 500 U.S. at 632, 111 S.Ct. at 2089 (O'Connor, J. dissenting) and therefore it is unclear when and whether to apply particular tests. See also Lebron v. National R.R. Passenger Corp., 115 S.Ct. 961, 964 (1995) (quoting Justice O'Connor). Further still, what is the use of having a strict "exclusive government function test" if an action otherwise deemed private under that test can become public under the "symbiotic relationship" test. Finally, the discrete test approach forced courts into pursuits of the viability of one or another test, rather than into an inquiry of whether under the facts of a particular case, there had been "state action." See, e.g., Majority Typescript at 14 n.6 (discussing question of whether symbiotic relationship test remains viable).

In my view, Edmonson provided a way out of the muddle, and we should take it. Rather than stating a series of discrete tests and applying them separately to determine whether each by itself is satisfied, the Court considered a number of factors, and weighed them to determine whether, all things considered, the otherwise private actor fairly could be deemed to be a state actor. Under that new framework, courts should consider the

principles furthered by the previous tests as part of a single balancing and weighing approach.  And it should apply to all cases involving the question of whether a private actor is engaged in state action.

The state action confusion certainly stemmed in part from the fact that the Court created what appeared to be discrete tests but then utilized them to address particular factual scenarios.  See Burton v. Wilmington Parking Auth., 365 U.S. 715, 722, 81 S.Ct. 856, 860 (1961) (courts must determine whether there is state action by "sifting facts and weighing circumstances").  Thus, the courts applied the different formulations on an ad-hoc basis to determine whether a party is attempting to hold the state or entity liable based on private actions "for which they cannot fairly be blamed."  Lugar, 457 U.S. at 936-37, 102 S.Ct. at 2753.  I believe the Edmonson language takes us full circle back to those principles and provides us a way out of the muddle by mandating that we apply a different -- and better and more flexible -- framework than the prior cases.

II.

Edmonson's discussion of the public function test further supports my conclusion that it set forth a new framework for deciding state-action issues.  As noted above, prior to Edmonson, in order to constitute state action under the public

function test, the action had to be traditionally within the exclusive prerogative of the state. But in Edmonson, the Court inquired only whether "the action in question involves the performance of a traditional function of the government." Edmonson, id. at 624, 111 S.Ct. at 2085. It appears that the Court intentionally deleted the exclusivity requirement for Justice O'Connor's dissent suggested that the majority had "misstated the law" by holding that "state action may be imputed to one who carries out a 'traditional governmental function.'" Id. at 639, 111 S.Ct. at 2093 (O'Connor, J., dissenting). The dissent continued: "In order to constitute state action under [the public function] doctrine, private conduct must not only comprise something that the government traditionally does, but something that only the government traditionally does." Id. at 640, 111 S.Ct. at 2093 (O'Connor, J. dissenting). In other words, Edmonson seems consciously to have eliminated the "exclusivity" requirement from the public function inquiry.[16] See also McKeesport Hospital v. Accreditation Council for Graduate Medical Ed., 24 F.3d 519, 528 (3d Cir. 1994) (Becker, J., concurring in

---

[16]. Judge Sarokin concurs that in Edmonson the Supreme Court deleted the "exclusivity" requirement from the public function inquiry. He concludes, however, in accordance with this concurring opinion that we are bound by the contrary holdings in Black, McKeesport, and Groman. See concurring opinion typescript at 2.

judgment) ("Edmonson . . . seemed to eliminate the 'exclusivity' requirement of the public function test for state action.").[17]

_____

[17]. The Court of Appeals for the Fourth Circuit, in analyzing the effect of Edmonson, held that "exclusivity" still is part of the public function test. It reasoned as follows:

> [W]e do not believe the Supreme Court would have attempted to change radically the government function standard set forth in Jackson, 419 U.S. at 353, and thereafter applied consistently in Flagg Bros., 436 U.S. at 157-58, Rendell-Baker, 457 U.S. at 842, Blum v. Yaretsky, 457 U.S. 991, 1005, 1011-12 (1982), [San Francisco Arts & Athletics v. United States Olympic Comm., 483 U.S. 522, 544-45 (1987)], and NCAA v. Tarkanian, 488 U.S. 179, 197-98 n.18 (1988), through the transparent puerilism of simple omission. If it had intended to change the law in this respect, we believe it would have said so explicitly. Moreover, the ultimate reasoning of the Court in Edmonson was that juror selection was traditionally an exclusive governmental function. See, e.g., Edmonson, 500 U.S. at 627 ("The selection of jurors represents a unique governmental function delegated to private litigants by the government and attributable to the government . . . ." (emphasis added)).

United Auto Workers, 43 F.3d at 906 n.2. While the United Auto Workers court's point is well taken, its rationale is based on a premise I reject -- that the public function test necessarily remains, in and of itself, a method of imposing state actor status. As discussed in the text, infra, I agree that the Supreme Court would not simultaneously have retained the public function test yet deleted the exclusivity requirement. That would be a breathtaking expansion of the state action doctrine. But it does make sense to delete the "exclusivity" requirement and use the public function concept as part of a broader state action inquiry. Thus, in my reading of Edmonson, it does not constitute such a radical change in the law that an explicit statement that "we abandon the exclusivity requirement" is required. After all, other than exclusivity, all the other

But, if Justice O'Connor's conclusion was correct --
that under the majority's analysis state action could be found
simply from the fact that the challenged action occurred within a
"traditional government function," the Court would have widened
significantly the category of "public functions."  After all,
"many functions have been traditionally performed by
governments."  Flagg Bros. Inc. v. Brooks, 436 U.S. 149, 158, 98
S.Ct. 1729, 1734 (1978).  Yet, if the three-test approach, under
which satisfaction of one of the discrete tests is enough, is the
only approach after Edmonson, then the Court in Edmonson would in
fact have expanded greatly the circumstances in which there had
been state action and the possibility of section 1983 liability.
I doubt that the Court intended that result and thus Edmonson is
best understood if it is recognized that an inquiry into whether
a private party performs a public function merely is one
important factor to consider in determining whether state action
exists.[18]

(..continued)
components of the public function test delineated in the prior
caselaw, such as that "receipt of public funds and the
performance of a function serving the public alone are not enough
to make a private entity a state actor," see Groman v. Township
of Manalapan, No. 94-5200, slip op. at 21 (3d Cir. Feb. 16,
1995), remain part of the test.

[18].  It is true, as the Court of Appeals for the Fourth Circuit
recently pointed out, that in Edmonson, the Supreme Court
described jury selection as a unique governmental function.
United Auto Workers, 43 F.3d at 906 n.2.  But if "unique" is to
be equated with "exclusive" under the discrete test approach, the
Court could have stopped at that point.  It did not; rather, the
Court went on to consider other factors as well.

In my reading, then, the three tests no longer (if they ever did) constitute discrete, dispositive tests to the exclusion of a broader approach. Instead, a court should consider the principles embodied in those tests in determining whether it is fair to find state action in a particular case. Thus, the fact that the action constituted a traditional governmental function, while certainly relevant, does not in itself necessarily mean there has been state action. Rather, a court generally should go on to consider other relevant factors.