**Joanne CANNON, Plaintiff,**

v.

**CITY OF PHILADELPHIA, et al., Defendants.**

**No. 98–CV–4790.**

United States District Court, E.D. Pennsylvania.

Feb. 24, 2000.

Mary Jane Deaves Hopkins, Philadelphia, PA, for Plaintiff.

Michael R. Resnick, City of Philadelphia, Dept. of Revenue, Philadelphia, PA, for Defendants.

### MEMORANDUM

BRODY, District Judge.

Now before me are cross-motions for summary judgment.[1] For the reasons that follow, I will grant defendants' motion and deny plaintiff's motion.

### I.  Background [2]

Plaintiff brings claims against the City of Philadelphia and several police officers pursuant to 42 U.S.C. § 1983. She claims that, while she was having a heart attack, police officers failed to transport her to the hospital and blocked the road with parked police cars preventing someone else from driving her to the hospital.

On September 11, 1996,plaintiff was painting in the basement of her home.  At

---

1.  Plaintiff refers to her motion as a counter-motion.  I will interpret plaintiff's motion as a cross-motion for summary judgment.

2.  The following facts are presented in the light most favorable to the plaintiff because I will deny plaintiff's motion for summary judgment, even viewing the facts in this manner.

approximately 1:00 p.m., she went outside to smoke a cigarette. While outside, she heard a gun shot coming from behind her house. She heard several more shots and then heard her dog barking inside her house. As she walked inside her house to see why the dog was barking, she met face-to-face with a man pointing a gun at her. She then ran out of her home to her neighbor's house. While in her neighbor's home, plaintiff and her neighbor observed the gunman exiting plaintiff's house. Plaintiff called 911 from her neighbor's home. After there was no response to her first call, plaintiff called 911 again. A few minutes later, plaintiff observed several neighbors walking out of their homes. Plaintiff exited her neighbor's home and saw a group of people congregating at the end of the block. Her neighbors told her that there was a multi-vehicle accident at the corner of Henry and Roxborough Avenues and that many police officers were on the scene.

Plaintiff walked toward the accident and saw an overturned truck, a smashed car and at least five police vehicles. Traffic was blocked and there were people standing around watching. Plaintiff asked an officer if the accident had anything to do with an armed man. The officer responded, "yes," and told the plaintiff that there had been a shooting. Plaintiff told the officer that: "If you are looking for a man with a gun, he just came through my house."[3] Pl. Dep. at 149. Plaintiff, accompanied by police officers, then returned to her home. The officers searched her home and plaintiff showed the officers where the gunman left her house and in which direction he fled.

An unknown officer told plaintiff to go in and secure her house, as she had to go to the police station and give a statement. Plaintiff responded that her children would be coming home from school soon and there would be no one to watch them when they arrived home. The officer told plaintiff that they would get someone to watch her children. When plaintiff went back in her home after turning off the lights and locking the windows and doors, she went upstairs to the bathroom to rinse her face. As she bent over the sink, she experienced shortness of breath and chest pains. Plaintiff came downstairs and walked outside where she saw Defendant Officer Beal and told him she could not go with him to the police station. When Beal asked the plaintiff why she could not go to the police station, plaintiff responded "I'm having terrible chest pain and shortness of breath." Pl. Dep. at 157–58. Beal told an unknown officer that plaintiff could not go with them because she was experiencing chest pain and shortness of breath. The unknown officer looked at plaintiff and said, "well, just get her name and number." Pl. Dep. at 158. Beal then asked for plaintiff's name and phone number and told her that they would get back to her.

Plaintiff's neighbor, Kris Bratten, came out of her house and asked plaintiff, "what's the problem?" Pl. Dep. at 158. Plaintiff responded, "Kris, I am having terrible chest pain and shortness of breath." Pl. Dep. at 158. Plaintiff asserts that while the officers were in close proximity, she repeated several times that she was having terrible chest pains. Another neighbor, Linda Maiden, also asked plaintiff what was wrong. Maiden then asked how plaintiff was going to get to the hospital. Maiden asked Beal and other unknown officers if they could take plaintiff to the hospital. Plaintiff did not hear the

---

**3.** Defendants claim that the gunman who broke into plaintiff's home was being chased by the police. During the chase, the gunman was involved in a car accident that resulted in a truck overturning. The gunman fled the scene with the police in pursuit. There was an exchange of gunfire and Police Sergeant Flemming was shot.

Plaintiff asserts that both Sergeant Flemming and the gunman had been transported to the hospital by 1:09 p.m. Pl.Resp.Exs.P. and Q. Plaintiff also claims that the police car congestion on the street was part of an "unannounced drill." Plaintiff, however, does not expand on what she means by an "unannounced drill."

officers' responses, but she heard Maiden ask the officers three times if they could take plaintiff to the hospital.[4] Then, the plaintiff asked the officers if they could drive her to the hospital and explained again that she thought she was having a heart attack. The officers told the plaintiff that they would not take her to the hospital. Plaintiff claims that her condition worsened as she waited for transportation (from chest pains and shortness of breath to back pain and left arm pain radiating down to her elbow).[5]

Maiden then offered to drive plaintiff the two blocks to the hospital. Maiden was unable to take her there, however, because the street was blocked with police cars. Therefore, plaintiff walked, with the assistance of Maiden, to the hospital. Maiden estimated that they walked a quarter mile from the plaintiff's home to the hospital. Plaintiff asserts that her condition worsened during the walk to the hospital. As a result of the heart attack, plaintiff sustained permanent heart damage and must take heart medication for the rest of her life. Additionally, plaintiff asserts that she has "changes of consciousness," mood and behavior and has been diagnosed with Posttraumatic Stress Disorder. Plaintiff claims that the officers' refusal to transport her to the hospital delayed her treatment and caused her condition to worsen.

## II. Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c). The party moving for summary judgment must inform the district court of the basis for its motion, and identify those portions of record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party does not bear the burden of persuasion at trial, as is the case here, its burden may be met by pointing out "an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Once the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading," *id.*, but must support its response with affidavits, depositions, answers to interrogatories, or admissions on file. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

The applicable standards by which a court must decide a motion for summary judgment do not change when the parties file cross-motions for summary judgment. *See Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3rd Cir.1987). Each motion must be considered separately and each side must establish a lack of genuine

---

4. According to plaintiff, the first time Maiden asked for help she was told that the officers needed authorization from a supervisor before they could transport the plaintiff to the hospital. The second time Maiden requested assistance she was ignored, and the third time she was told no cars were available to take the plaintiff to the hospital. Plaintiff also claims that Maiden "begged" the officers to

help plaintiff get to the hospital. Pl. Resp. at 5.

5. Plaintiff asserts that an injured dog (the dog had been shot) was driven to the veterinarian by an officer, while no one could take her to the hospital.

issue of material fact and that it is entitled to judgment as a matter of law. *See Nolen v. Paul Revere Life Ins.*, 32 F.Supp.2d 211, 213 (E.D.Pa.1998).

### III. Discussion

■ Plaintiff brings two claims pursuant to 42 U.S.C. § 1983. By itself, § 1983 does not create any rights, rather § 1983 provides a remedy for violations of rights created by the Constitution or federal law. *See, e.g., Morse v. Lower Merion School District*, 132 F.3d 902, 906–07 (3rd Cir. 1997). In order to state a claim under § 1983, plaintiff must show that defendants, acting under color of state law, deprived her of a right secured by the Constitution or the laws of the United States. *See id.* at 907. Plaintiff alleges that defendants violated her Fourteenth Amendment right to substantive due process by failing to help her or actively delaying her efforts to reach the hospital, when she was having a heart attack. Plaintiff brings § 1983 claims: (A) against individual police officers alleging that the officers created a danger resulting in harm to the plaintiff and (B) against the City of Philadelphia alleging an unconstitutional custom or practice and a failure to train its officers.

### A. The State–Created Danger Exception

■ In general, state actors have no affirmative obligation to protect citizens from injuries caused by others or themselves. *See DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195–96, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). There are two exceptions to this rule: (1) the special relationship exception, which allows the plaintiff to recover when the state enters into a special relationship with a particular citizen and fails to protect

the health and safety of the citizen to whom it owes an affirmative duty,[6] and (2) the state-created danger exception, which allows the plaintiff to recover when, under certain circumstances, a state actor creates a danger that causes harm to an individual. *See Morse v. Lower Merion School District*, 132 F.3d 902, 907 (3rd Cir.1997). Plaintiff brings her claims against Defendant Beal and other police officers pursuant to the state-created danger exception.

#### 1. *Third Circuit instruction on the state-created danger exception*

In *Kneipp v. Tedder*, 95 F.3d 1199 (1996), the Third Circuit enumerated a four part test that a plaintiff must satisfy to prevail on a claim based upon a danger created by a state actor:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) the state actor acted in willful disregard for the safety of the plaintiff;

(3) there existed some relationship between the state and the plaintiff; and

(4) the state actors used their authority to create an opportunity that otherwise would not have existed for the harm to occur.

*See id.* at 1208 (citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3rd Cir. 1995)).

Applying this four part test, *Kneipp* held that there was a triable issue of fact as to whether the defendants (police officers) had violated Samantha Kneipp's Fourteenth Amendment right to substantive due process when, despite her severely intoxicated state, the defendants released her to return home alone after having earlier allowed her husband, Joseph Kneipp, to leave the scene. When the officers stopped the Kneipps they

---

6. A special relationship exists when "the State by the affirmative exercise of its power so retrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses

the substantive limits on state action set by ... the Due Process Clause."' *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998. For example, the "special relationship" exception may apply to an incarcerated prisoner or an involuntarily committed mental patient.

were only one-third of a block away from their home. *See id.* at 1201. Before Samantha's detention by the police, for public drunkenness and disturbing the peace, Joseph was in the process of helping Samantha home because she was too intoxicated to walk on her own. After the officers detained the Kneipps, Joseph told one of the officers that he had a babysitter watching his son and that he needed to get home. The officer told Joseph that he could leave. Joseph testified that because Samantha was drunk, he assumed that the police officers were going to take her either to the hospital or to the police station. *See id.* at 1202. The Third Circuit reasoned that "[a] reasonable jury could believe that Joseph was correct in assuming that the police would take care of Samantha given his need to get home and care for their son." *Id.* at 1202 n. 7. In evaluating whether the officer acted with "willful disregard" in allowing Samantha to walk home on her own, the court held that "the plaintiffs have adduced sufficient evidence to raise a material issue as to whether [the officer] acted in willful disregard for Samantha's safety .... by [the officer's] own testimony, he admitted that he knew Samantha was drunk." *Id.* at 1208–09. In conclusion, the Third Circuit held that "the evidence submitted was sufficient to raise a triable issue of fact as to whether the police officers affirmatively placed Samantha in a position of danger." *Id.* at 1211.

In *Morse v. Lower Merion School District,* 132 F.3d 902 (3rd Cir.1997), the Third Circuit again applied the state-created danger exception, this time upholding the dismissal of the plaintiff's claims. In *Morse,* a teacher was shot and killed in the Ardmore Child Care Center by a local resident with a history of mental illness. The gunman entered the school through an unlocked rear door. *See id.* at 904. The plaintiffs in *Morse* asserted that the School District had a written policy requiring that all side and back entrances be locked at all times and the School District was aware of, and facilitated, construction workers'

access through the unlocked back door. *See id.* Applying the *Kneipp* test, the Third Circuit concluded that the plaintiff did not set forth a claim under § 1983. The Third Circuit's decision rested, in part, on the fact that the attack, by the mentally ill resident, was not foreseeable. *See id.* at 908.

### 2. Recent guidelines on substantive due process by the United States Supreme Court and the Third Circuit

After the Third Circuit decided *Kneipp* and *Morse,* the United States Supreme Court in *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), took the opportunity, in a case involving a police chase, to outline the procedure courts should use to arrive at the proper standard of fault necessary to maintain a substantive due process claim against a state actor. *Lewis* holds that the standard of fault necessary to trigger § 1983 liability is directed by the context of the relevant state action. Because *Lewis* analyzes the overarching framework of substantive due process, its teaching applies to a state-created danger claim. Therefore, *Lewis* affects the application of *Kneipp* and *Morse.*

In *Lewis,* police officers attempted to pull over a motorcycle driven by Brian Willard, age 18, with Phillip Lewis, age 16, as a passenger. Instead of pulling over, Willard sped away and a high-speed police chase ensued, ending when the motorcycle tipped over. Lewis was pronounced dead on the scene. *See Lewis,* 118 S.Ct. at 1712. Lewis' parents and the representatives of his estate brought an action pursuant to § 1983 against Sacramento County, the Sacramento County Sheriff's Department, and a law enforcement officer alleging a deprivation of Lewis' right to substantive due process under the Fourteenth Amendment. The Supreme Court granted *certorari* to resolve a conflict among the Circuit courts over the proper standard of

culpability on the part of a law enforcement officer for violating substantive due process in a pursuit case. *See id.* at 1713.

In delivering the opinion of the Court, Justice Souter observed that "[w]e have emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government ...'". *Id.* at 1716 (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974) (citations omitted)). The Court explained that "cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'...". *Id.* (quoting *Collins v. Harker Heights,* 503 U.S. 115, 129, 112 S.Ct. 1061, 1071, 117 L.Ed.2d 261 (1992)). Additionally, Justice Souter stated, "for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience .... [and][w]hile the measure of what is conscience-shocking is no calibrated yard stick, it does, as Judge Friendly put it, 'poin[t] the way.'" *Id.* at 1717 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2nd Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). Therefore, the Court held that in substantive due process cases the action of the state actor must "shock the conscience" to trigger § 1983 liability.[7]

The Court stated that "the constitutional concept of conscience-shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Id.* Emphasizing that negligence alone was never enough, the Court observed that:

Whether the point of the conscience-shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, ... is a matter of closer calls .... some official acts in this range may be actionable under the Fourteenth Amendment ...

*Id.* at 1718 (internal quotations omitted). In determining whether an officer's actions shock the conscience in a substantive due process case, the Court required a determination of where on the spectrum of culpability the officer's actions fall.

The appropriate standard by which to consider if the state actor's behavior "shocks the conscience" must be evaluated in context of the relevant police activity at the time of the incident. In *Lewis,* the Court explained that "[r]ules of due process are not ... subject to mechanical application ...". *Id.* Accordingly, "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking." *Id.* 1718–19. The Court compared the position of prison officials, who risk liability when they act with deliberate indifference to a prisoner's medical needs, with the position of police involved in a high-speed chase. The Court held that:

attention to the markedly different circumstances of normal pretrial custody and high-speed law enforcement chases shows why the deliberate indifference that shocks in the one case is less egregious in the other (even assuming that it makes sense to speak of indifference as

---

**7.** While holding that "shocks the conscience" is the appropriate level of fault, the Court also recognized that deliberate indifferent conduct is enough to satisfy the fault requirement for due process claims based on the medical needs of a pre-trial detainee. The Court explained that "[d]eliberate indifference that

shocks in one environment may not be so patently egregious in another ...". *Lewis,* 118 S.Ct. at 1718. Therefore, the Court suggested that in certain circumstances deliberate indifference may be enough to shock the conscience.

deliberate in the case of sudden pursuit). As the very term "deliberate indifference" implies, the standard is sensibly employed only when actual deliberation is practical, ... and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory ...

*Id.* at 1719. The Court further reasoned that "just as the description of the custodial prison situation shows how deliberate indifference can rise to a constitutionally shocking level, so too does it suggest why indifference may well not be enough for liability in ... different circumstances." *Id.* Therefore, the Court concluded that:

Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made "in haste, under pressure, and frequently without the luxury of a second chance." ... A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to everyone within stopping range, be they suspects, their passengers, other drivers, or bystanders.

*Id.* at 1720 (quotations omitted). The Court, therefore, held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id.* Thus, "[r]egardless whether Smith's [the state actor's] behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience, and petitioners are not called upon to answer for it

under § 1983." *Id.* at 1721. Therefore, differences in circumstances surrounding types of executive action affect plaintiff's ability to recover on a § 1983 substantive due process claim.

Recently, the Third Circuit in *Miller v. City of Philadelphia,* 174 F.3d 368 (3rd Cir.1999), applied the analysis of *Lewis* in a substantive due process case that did not involve a police chase. In *Miller,* a mother, her children and their attorney sued the City of Philadelphia, the Philadelphia Department of Human Services ("DHS"), a DHS social worker, the Children's Hospital of Philadelphia ("CHOP") and two CHOP security guards alleging violations of their procedural and substantive due process rights under § 1983. *See Miller,* 174 F.3d at 370. The *Miller* plaintiffs' claims arose from an emergency *ex parte* child custody hearing after which two children were removed from their mother's custody.[8] *See id.* at 370–71. Following *Lewis,* the *Miller* court viewed the state actor's actions contextually. The *Miller* court, citing *Lewis,* explained that "[t]o generate liability, executive action must be so ill-conceived or malicious that it 'shocks the conscience.'" *Id.* at 375 (quoting *Lewis,* 118 S.Ct. at 1717). *Miller* also held that "[t]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." *Id.* The court concluded that:

We recognize that a social worker acting to separate parent and child does not usually act in the hyperpressurized environment of a prison riot or a high-speed chase. However, he or she rarely will have the luxury of proceeding in a deliberate fashion, as prison medical officials can. As a result, in order for liability to attach, a social worker need not have acted with the "purpose to cause harm," but the standard of culpability for substantive due process purposes must exceed both negligence and deliberate in-

---

**8.** Miller's children were eventually returned to her custody. *See Miller,* 174 F.3d at 371.

difference, and reach a level of gross negligence or arbitrariness that indeed "shocks the conscience."

*Id.* at 375–76. Therefore, in *Miller* the Third Circuit applied the framework set forth in *Lewis* in evaluating the necessary level of fault for state actors given the context of the state actor's actions.

3. ***Impact of recent United States Supreme Court decision (Lewis) and Third Circuit decision (Miller) on earlier Third Circuit articulation of state-created danger exception (Kneipp)***

The Third Circuit in *Fagan v. City of Vineland,* 22 F.3d 1296 (3rd Cir.1994) (en banc) (*Fagan II*) held that, in a police pursuit case, involving an alleged violation of substantive due process rights, the actions of the state actor must shock the conscience to trigger liability. *See id.* at 1303. In *Kneipp,* however, the Third Circuit distinguished *Fagan II.* In *Kneipp,* the court recognized that *Fagan II* "declined to consider the applicability of the *DeShaney* line of cases which imposed a constitutional duty in limited situations, i.e., special relationship or custody cases, to police pursuit cases, as this issue was not raised by the parties or addressed by the district court." *Kneipp,* 95 F.3d at 1207. The *Kneipp* court also explained that "the plaintiffs in *Fagan II* did not advance the state danger theory as a basis for establishing a constitutional violation." *Id.* Therefore, the *Kneipp* court held that "the *Fagan II* shocks the conscience standard is limited to police pursuit cases, and accordingly, we are not bound to follow that standard in the case before us." *Id.* at 1207–08.

In *Lewis,* the Supreme Court, held that "shocks the conscience" is the standard of fault triggering § 1983 liability in substantive due process cases involving abusive executive action.[9] Although *Lewis* was a police pursuit case, the Court explained that the "shocks the conscience" standard applies to all substantive due process cases involving abusive executive action. In *Miller,* the Third Circuit recognized that *Lewis* requires a court, in all substantive due process cases, to determine if the state actor's behavior shocks the conscience. Therefore, *Lewis* and *Miller* hold that a state actor's behavior must shock the conscience to trigger § 1983 liability. The state-created danger exception, recognized in *Kneipp,* arises from substantive due process rights. Consequently, because state-created danger is a subset of substantive due process, *Lewis* and *Miller* require that, in a state-created danger case, the actions of the state actor must shock the conscience to trigger liability. In sum, the analysis of *Lewis* and *Miller* is significant because it affects the application of the *Kneipp* test.

The second *Kneipp* factor addresses the standard of fault that the plaintiff must prove to trigger liability in a state-created danger claim. This part of the *Kneipp* test required that the state actor acted with willful disregard for or deliberate indifference to plaintiff's safety. *See Morse,* 132 F.3d at 910. *Lewis* and *Miller* require that the actions of the state actor must shock the conscience to trigger § 1983 liability.[10] Therefore, under *Lewis* and *Miller,* in order for the plaintiff to prevail on the second *Kneipp* prong, a plaintiff must prove that the state actor's behavior shocks the conscience.[11] A determination

**9.** In reaching this conclusion, the *Lewis* Court cited *Fagan II* in a list of divergent Circuit court cases necessitating the Supreme Court determination of the standard of culpability on the part of law enforcement officers for violating substantive due process in a pursuit case. *See Lewis,* 118 S.Ct. at 1713.

**10.** *Lewis* indicates that under certain circumstances and conditions, deliberate indifference may satisfy the "shocks the conscience" standard. *See* 118 S.Ct. at 1718.

**11.** Similarly, in applying the state-created danger test, Judge Shapiro in *Schieber v. City of Philadelphia,* No. 98–5648, 1999 WL 482310 (E.D.Pa. July 9, 1999), citing *Lewis* and *Miller,* held that "[w]hen addressing whether the officers acted with wilful disregard, the appropriate test to apply to the

of whether the actions of the state actor shock the conscience requires an evaluation of the context in which they acted. In other words, because *Lewis* and *Miller* hold that a determination of what shocks the conscience depends on the circumstances in which the incident occurred, identical actions of a state actor may be sufficient to set forth a state-created danger claim in one context, while it will not suffice in another context.[12]

Because I find that the officer's actions in this case do not shock the conscience, the plaintiff fails to satisfy the second prong of the *Kneipp* test.

### 4. Application of the second prong of the Kneipp test to this case

As described above, I have determined that after the decisions of *Lewis* and *Miller*, the second *Kneipp* factor is a "shock the conscience" standard requiring an examination of the circumstances in which the officer acted.

Both *Lewis* and *Miller* involved pressurized situations in which the state actors were required to make quick decisions, whereas the facts of *Kneipp* did not involve similarly pressurized circumstances. In *Lewis*, the Court held that the officer's actions did not shock the conscience because the officer did not intend to harm the suspects as they fled on the motorcycle. In *Miller*, the Third Circuit, applying the shocks the conscience test, did not require that the social worker acted with a purpose to cause harm, but rather re-

quired that the social worker's actions reach a level of gross negligence or arbitrariness. The *Lewis* case involved a high-speed police chase and the *Miller* case arose from the removal of children from a mother's custody due to suspected abuse. In both cases, the decisions of the state actors were made in pressurized situations without the luxury of proceeding in a deliberate fashion. Conversely, in *Kneipp*, there is no evidence that the officers were in a highly pressurized situation when they stopped the Kneipps for causing a disturbance. The officers in *Kneipp* were able to proceed in a more deliberate fashion than the state actors in *Lewis* and *Miller*. Therefore, in evaluating whether the officer's actions shock the conscience, I must analyze whether the officers in this case were acting in a pressurized situation, inhibiting their ability to act in a deliberate fashion.

■ In this case, plaintiff asserts that the officers acted with willful disregard for her safety because they knew of her illness and did not try to obtain a substitute car or call 911. In addition, plaintiff claims that because the officers allowed the street to remain blocked, they created a dangerous environment. Defendants contend that Officer Beal did not create a dangerous environment nor did he prevent the plaintiff from getting to the hospital.[13] According to the defendants, there was a large scale police manhunt underway to find the gunman who shot Sergeant Flemming and broke into plaintiff's home.[14]

12. As *Lewis* recognized, "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another ...". 118 S.Ct. at 1718.

13. Defendants do not raise, and therefore I will not address, the defense of qualified immunity.

14. Plaintiff asserts that the police car congestion on the street was the result of an "unannounced drill." Plaintiff, however, does not expand on what she means by an "unannounced drill" and presents no evidence on this. Pl. Resp. at 11. Plaintiff also suggests

actions of the officers is whether their conduct 'shocks the conscience.'" *Id.* at *4 (citing *Lewis*, 118 S.Ct. at 1720 and *Miller*, 174 F.3d 368) (granting motion to dismiss in part where plaintiffs brought suit against the city as a result of police officers' alleged failure to adequately investigate report that neighbors heard woman screaming in her apartment). Judge Shapiro concluded that a court "must consider how much time the governmental actor had to contemplate the appropriate course of conduct .... [and][t]he underlying government action must be considered, not the outcome." *Id.* at *5 (citations omitted).

Under such circumstances, defendants assert, it cannot be said that Officer Beal acted with "willful disregard for or deliberate indifference" to plaintiff's safety. Defendants claim that at worst, Officer Beal's conduct was negligent.

As in *Lewis* and *Miller*, the officers in this case did not have the luxury of proceeding in a deliberate fashion. Although the police activity in this case may not rise to the level of the "hyperpressurized" environment of a police chase, the situation did not unfold in a vacuum. The police radio transmissions during the relevant time reveal that the events took place while officers were searching for alleged suspects and while officers were attempting to secure a crime scene. The officers' actions must be considered within the context of this surrounding police activity. As *Lewis* indicates, police officers frequently have obligations that tug in different directions. *See* 118 S.Ct. at 1720. Here, the officers were attempting to apprehend a suspect and secure a crime scene and at the same time address the plaintiff's request for transportation to the hospital. The police officers were operating in the relative chaos of a recent shooting and accident and, therefore, were attempting to balance a multitude of competing concerns (e.g. collecting evidence, interviewing witnesses, apprehending suspects). Regardless of whether the officers conduct "offended the reasonableness held up by tort law," the officers' conduct, in the context of a chaotic and dangerous crime scene, does not shock the conscience. *Lewis*, 118 S.Ct. at 1721. Therefore, I find that while the officers may have been negligent, their conduct

does not rise to a culpable level for § 1983 liability and the plaintiff fails to satisfy the second part of the *Kneipp* test. Because the plaintiff fails to meet the second *Kneipp* factor, I will not address the remaining three prongs of the test.

**B. Claims against the City of Philadelphia**

Plaintiff's second § 1983 claim is against the City of Philadelphia (the "City"). Plaintiff claims that (1) a policy or custom of the City resulted in a violation of her constitutional rights [15] and (2) the City is liable for failing to adequately train its police officers.

The Supreme Court in *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611, (1978), enunciated the rule for imposing liability on a municipality:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694, 98 S.Ct. 2018. Therefore, a municipality cannot be held liable for the unconstitutional acts of its employees under a *respondeat superior* theory. Local government bodies, however, may be held liable if a state actor acts unconstitutionally pursuant to a government policy or custom.[16] *See id.* at 658, 98 S.Ct. 2018. The

---

that the gunman was in police custody at the time the officers refused to transport her to the hospital. Pl. Resp. at 10–11. After reviewing the police officers radio transmissions during the date and time of this incident I find that there was ongoing police activity including searching for other possible suspects and securing the crime scene in or around the time that plaintiff requested the officers transport her to the hospital. Pl. Resp., Exs. P and Q. For example, when the officers went to plaintiff's home, after she informed them that a gunman had been in-

side her house, the officers were still looking for a suspect.

**15.** While plaintiff's municipal liability claim on this issue is ambiguous, in an abundance of caution, I will assume that plaintiff brings a claim based on an unconstitutional policy or custom.

**16.** A policy is made when "a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' is-

plaintiff must show that the official policy or custom caused the deprivation of a constitutionally-protected right and the policy or custom must be the "moving force" behind the constitutional tort. *See Board of the County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

■ Section 1983 liability may attach to a municipality if it failed to adequately train its employees and that failure caused the underlying constitutional violation. *See City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Court in *Canton* held that: "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. 1197. The Court also held the plaintiffs must prove that the "deficiency in training actually caused the police officers' indifference to [the individual's] medical needs." *Id.* at 391, 109 S.Ct. 1197. Before addressing whether plaintiff's claims against the City meet the required standards, I must evaluate the effect on the claim directly against the municipality, of granting summary judgment in favor of the individual officers.

### 1. *Effect of granting summary judgment in favor of the individual officers on plaintiff's municipal liability claim*

In 1986, the Supreme Court held that a municipal entity cannot be held liable under the Fourth Amendment if there is no underlying constitutional violation by the individual officer. *See City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam). In 1994, distinguishing *Heller*, the Third Circuit held that the granting of summary judgment in favor of the individual officers does not preclude consideration of municipal liability. *See Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3rd Cir.1994) (*Fagan I*). The Third Circuit reasoned that:

> [I]n a substantive due process case arising out of a police pursuit, an underlying constitutional tort can still exist even if no individual police officer violated the Constitution. Unlike in *Heller*, the plaintiffs in this case brought separate, independent constitutional claims against the pursuing officers and the City.

*Id.* at 1292. Similarly, in the case before me, the plaintiff has alleged substantive due process claims and has independently alleged constitutional claims against the City.[17] *Fagan I* articulated that the claims against the individual officers and the City "are based on different theories and require proof of different actions and mental states." *Id.* For liability to attach to the individual officers, the officers' actions must shock the conscience. *See id.* In this case, as already discussed in detail under section A, the officers' actions do not shock the conscience. *Fagan I*, takes the position that in a failure to train case, municipal liability attaches "[i]f its [the city's] policymakers, acting with deliberate indifference, implemented a policy of inadequate training and thereby caused the officers ... to deprive the plaintiffs of life or liberty." *Id.* Therefore, *Fagan I* concludes that the standard of culpability for municipal liability in a failure to train case is different than that for substantive due

sues an official proclamation, policy, or edict." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3rd Cir.1996) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3rd Cir.1990) (citations omitted)). A custom is defined as "such practices of state officials so permanent and well-settled as to virtually constitute law." *Id.* Custom may also be established "by evidence of knowledge and acquiescence." *Id.*

17. Based upon jurisprudence of the Third Circuit to date, I find that there is no reason to limit the applicability of *Fagan I* to police pursuit cases.

process claims against individual state actors.

Although *Fagan I* suggests that the appropriate standard for municipal liability, in a failure to train case, without individual liability, is simply "deliberate indifference," a review of relevant cases indicates that the applicable standard is less clear. In *Canton*, the Supreme Court held that when a state actor commits the underlying constitutional tort, to hold the municipality liable in a failure to train case, the municipality must be deliberate indifferent. *See Canton*, 489 U.S. at 388, 109 S.Ct. 1197. In *Canton*, the Court "assume[d] that respondent's constitutional right to receive medical care was denied by the city employees whatever the nature of that right might be." *Id.* at 389 n. 8, 109 S.Ct. 1197. Therefore, the *Canton* court accepted that the state actor violated the plaintiff's constitutional rights before determining that the municipality had to be deliberately indifferent to trigger liability.

In *Collins v. City of Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), the Supreme Court explained that "proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Id.* at 120. *Collins*, therefore, held that for municipal liability to attach there must first be an underlying constitutional violation. *See id.; see also Kneipp*, 95 F.3d at 1212 n. 26. In *Collins*, unlike in *Canton*, the Court assumed that "the allegations in the complaint are sufficient to provide a substitute for the doctrine of respondeat superior as a basis for imposing liability on the city for the tortious conduct of its agents ...". *Collins*, 503 U.S. at 124, 112 S.Ct. 1061. As the Third Circuit has explained, the *Collins* Court "assumed that the municipality was re-

sponsible for the injury and asked whether the injury was of constitutional proportions. Thus, it reversed its focus from that in *City of Canton*." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1149 (3rd Cir. 1995). In explaining the denial of the plaintiff's claim, the *Collins* Court stated that "[w]e ... are not persuaded that the city's alleged failure to train its employees, or to warn them about known risks of harm, was an omission that can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." [18] *Id.* at 128. *Collins*, therefore, requires that a municipality's actions must shock the conscience to create a constitutional violation.

The Third Circuit in *Fagan I*, decided after both *Canton* and *Collins*, held that an underlying constitutional tort can exist even if no individual state actor violated the plaintiff's constitutional rights. *Fagan I*, therefore, indicates that the underlying constitutional violation may be committed by the municipality. *Fagan I* proposes that a municipality's failure to train, even without an individual state actor's liability, need only be deliberately indifferent to trigger liability. Therefore, reading *Canton*, *Collins* and *Fagan I* together, the applicable standard of fault in a municipal liability case, in which the individual state actors did not commit a constitutional tort, remains unclear.

The holding of *Fagan I* has been questioned by a later Third Circuit case. In *Mark*, the Third Circuit compared *Collins* with *Fagan I* and *Fagan II*, concluding that:

[T]he *Fagan* panel [*Fagan I*] opinion appeared to hold that a plaintiff can establish a constitutional violation predicate to a claim of municipal liability simply by demonstrating that the policymakers, acting with deliberate indif-

---

**18.** In *Fagan II*, the Third Circuit, confirmed that "[i]n *Collins*, which represents the Supreme Court's most recent pronouncement on substantive due process as applied in a civil damage action, the Court unanimously reaffirmed the viability of the 'shocks the conscience' standard." *Fagan II*, 22 F.3d at 1304.

ference, enacted an inadequate policy that caused an injury. It appears that, by focusing almost exclusively on the "deliberate indifference" prong of the *Collins* test, the panel opinion did not apply the first prong—establishing an underlying constitutional violation. *Mark,* 51 F.3d at 1153 n. 13. The *Mark* court acknowledged that "there is some inconsistency in our circuit as to the standard governing the underlying constitutional violation in policy, custom or practice cases." *Id.* The court, however, did not decide the appropriate level of fault in a municipal liability case, in the absence of individual state actor liability, because "[a]t any rate ... we believe that the defendants' actions and omissions not only fail to shock the conscience, but cannot be characterized as deliberately indifferent." [19] *Id.* In *Kneipp,* however, the Third Circuit suggested that while the *Mark* court noted some inconsistency regarding the applicable standard of care for the underlying constitutional violation in policy or custom cases, the court did not indicate that there was an inconsistency in municipal liability cases regarding an alleged failure to train. *See Kneipp,* 95 F.3d at 1212 n. 27. The *Kneipp* court explained that:

As we noted in *Mark,* some inconsistency exists in this circuit as to the standard of care to be applied to the underlying constitutional violation in policy, custom or practice cases.... In *Fagan II,* we interpreted *Collins* to hold that the appropriate test in all substantive due process cases is whether the defendant's actions shock the conscience.... In articulating the standard of care for municipal liability, however, we explained that the shocks the conscience

standard applied to determine the liability of the pursuing police officers under section 1983, while a deliberate indifference standard applied to determine the municipality's liability. [citing *Fagan I* ] ... Although *City of Canton* predated our opinions in *Fagan I & II* and the Supreme Court's decision in *Collins,* we continue to recognize the application of the deliberate indifference standard to ascertain municipality liability as the constitutional standard in failure to train police officers cases.

*Id.* Therefore, the *Kneipp* court suggests that while *Fagan I* does not clarify the appropriate standard for municipal liability in policy or custom cases, *Fagan I* appropriately held that "deliberate indifference" is the standard in failure to train cases.

In *Simmons v. City of Philadelphia,* 947 F.2d 1042 (3rd Cir.1991), a Third Circuit case decided before *Fagan I* and *Collins,* now Chief Judge Becker, analyzed the appropriate level of fault necessary to prevail on a § 1983 claim against a municipality in the absence of an individual state actor's liability slightly differently. *See id.* at 1059. In *Simmons,* the mother of a decedent brought a § 1983 action against the City of Philadelphia and an individual officer after her son hung himself while in police custody. *See id.* at 1050. *Simmons* involved a claim that the City's policy or custom violated the decedent's constitutional rights, as well as an assertion that the City failed to adequately train police officers. The jury found that although the individual officer did not violate the decedent's constitutional rights, the municipality was liable under § 1983. *See id.* at 1054. Judge Becker in finding no incon-

19. Additionally, a recent law review article notes that "the Third Circuit Court of Appeals has most consistently embraced the approach to municipal liability that ignores the important distinction between the Supreme Court's statutory interpretation of § 1983 in *Canton* and its constitutional analysis of substantive due process in *Collins.*" Karen M. Blum, *Municipal Liability: Derivative or Direct? Statutory or Constitutional? Distinguishing* the Canton Case from the Collins Case, 48 DePaul L.Rev. 687, 702–03 (Spring 1999). Professor Blum explains that "[t]he Third Circuit's mistake in *Fagan [Fagan I]* is in treating proof of statutory [§ 1983] responsibility under *Canton's* deliberate indifference standard as proof of constitutional [substantive due process] liability under *Collins.*" *Id.* at 705.

sistency in the jury's § 1983 verdicts, held that to establish municipal liability the plaintiff must both identify a particular official with policymaking authority in the areas in question and adduce "scienter-like" evidence with respect to the policy-maker. *See id.* at 1062–63. In a concurring opinion, then Chief Judge Sloviter, objected to the "scienter-like" requirement imposed by Judge Becker. *See id.* at 1089–90. Judge Sloviter explained that "because of the common equation of 'scienter' with intentional action, I am concerned that Judge Becker's use of the term will be misread as limiting section 1983 cases to those where plaintiffs can show defendants knew of the constitutional deprivation and excluding those cases where plaintiffs argue that defendants should have known of it." *Id.* at 1090. Judge Becker, seemed to require a higher level of culpability, a "scienter-like" requirement on the part of the policymakers, because *Simmons* was about the underlying constitutional violation committed by the City. Judge Sloviter, however, noted that *Canton* does not require actual knowledge or intentional conduct for a finding of deliberate indifference on the part of the municipality. Thus, Chief Judge Becker and Judge Sloviter were grappling with the necessary level of culpability for municipal liability in the absence of an individual state actor's liability. *See also* Karen M. Blum, *Municipal Liability: Derivative or Direct? Statutory or Constitutional? Distinguishing the Canton Case from the Collins Case*, 48 DEPAUL L.REV. 687, 702–03 (Spring 1999).

In sum, I am presented with various conflicting interpretations of the appropriate level of culpability applicable in a § 1983 case against a municipality in which the individual state actors are not liable. The confusion regarding how to evaluate a municipality's liability is buttressed by the seeming disagreement between present Chief Judge Becker and past Chief Judge Sloviter in *Simmons* and the Third Circuit's recognition in *Mark* of *Fagan I's* failure to evaluate the applicable standard for the underlying constitutional violation.

The cases discussed above (*Fagan I* and *II, Canton, Collins, Mark, Kneipp* and *Simmons* ) were all decided before the Supreme Court's decision in *Lewis*. *Lewis* may shed light on the appropriate standard of fault applicable in a claim against a municipality in the absence of individual state actor's liability. *Lewis* explained that the " 'touchstone of due process is protection of the individual against arbitrary action of government ...' ". 118 S.Ct. at 1716 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974)). *Lewis* recognized that "the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.' " *Id.* at 1717 (quoting *Collins*, 112 S.Ct. at 1070.). In *Lewis*, the Court utilized a contextual analysis to evaluate whether an individual officer violated the decedent's constitutional rights. While *Lewis* did not address municipal liability, the instruction of *Lewis* arguably intimates that a contextual approach may be applied in evaluating a municipality's liability in the absence of an individual state actor's liability. In order for a municipality to commit the necessary underlying constitutional tort, an expansive reading of *Lewis* may suggest that the municipality's policy, custom or failure to train, viewed contextually, must shock the conscience. The conduct that satisfies this standard may differ depending on the circumstances. Therefore, while a state actor's behavior may not shock the conscience, the municipality's policy, custom or failure to train may be conscience shocking.

Fortunately, in the case before me, I need not determine the appropriate standard of liability for a § 1983 claim against a municipality, in the absence of an individual state actor's liability. Even assuming that the plaintiff's constitutional rights were violated, the plaintiff fails to show that the municipality's policy, custom or

failure to train caused her constitutional injury. Additionally, regardless of which standard applies plaintiff fails to demonstrate that the City's policies, customs, or failure to train are deliberately indifferent or shock the conscience. Therefore, even assuming the existence of an underlying constitutional violation and that the City need only be deliberately indifferent to trigger municipal liability, I will grant the defendants' summary judgment motion.

### 2. *Policy or custom*

Plaintiff states that the City of Philadelphia ("City") has a "government custom on non-training in First Aid" and this custom was the "proximate cause of the injuries Ms. Cannon sustained." Pl. Resp. unnumbered at 15. Plaintiff asserts that: "[d]irections ... given as to how to deal with that catastrophic event [a heart attack], and directions that when breathing and pulmonary activity ... stops to administer CPR and activate the EMS ... [are] contrary to the first aid instructions in *How to Recognize a Heart Attack.*" Pl. Resp. unnumbered at 9. The American Red Cross instructions regarding how to recognize a heart attack, attached to the plaintiff's brief, state in part that: "[I]t is essential that the nearest person activate EMS systems and be prepared to perform CPR if necessary. If you are with someone who is having the signals of a heart attack and if they last longer than a few minutes, act at once." Pl.Ex. K. Captain Grover, the commanding officer of the Philadelphia Police Academy's Recruit Training Unit, testified that: "We teach signs and symptoms of recognition of heart attack, we give direction as to how to deal with that catastrophic event, and we give direction when breathing and pulmonary activity stops to administer CPR and activate the EMS, which means call fire rescue." *See* Grover Dep. at 6–7, 13–14. Plaintiff suggests that Captain Grover's statement above indicates that the officers were not trained to activate EMS until after someone's breathing and pulmonary activity stopped. Therefore, plaintiff suggests that Captain Grover's statement indicates that the City gives inappropriate information to officers regarding suitable conduct when confronted with a potential heart attack victim.

Although this argument is not developed by the plaintiff, viewing plaintiff's claims in the most favorable light, plaintiff may be asserting that Captain Grover's "edicts or acts may fairly be said to represent official policy" and therefore, his failure to adequately instruct the officers in first aid is an unconstitutional custom or practice of the City. Plaintiff presents no evidence that Captain Grover's statement, made during a deposition, is the policy or custom of the City. Even if Captain Grover's statement may be deemed the policy of the City, there is no evidence that the statement of Captain Grover caused the purported constitutional injury. There is nothing in the record to suggest that the officers failed to transport the plaintiff to the hospital because they were waiting for the plaintiff to stop breathing before calling EMS. Plaintiff, therefore, also failed to satisfy the causation element of this *Monell* claim. Consequently, I will grant summary judgment on Plaintiff's claim that the City's policies or customs violated her constitutional rights.

### 3. *Failure to train*

In *Reitz v. County of Bucks,* 125 F.3d 139 (3rd Cir.1997), the Third Circuit noted that "[e]stablishing municipal liability on a failure to train claim under § 1983 is difficult." *Id.* at 145. In assessing municipal liability for failure to train, the focus is on the adequacy of the training program in relation to the tasks that the particular officers must perform. *See Canton,* 489 U.S. at 390, 109 S.Ct. 1197. The fact that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability to the city, since the officer's shortcomings may have resulted from factors other than a faulty training program. *See id.* at 390–91, 109 S.Ct.

1197. Evidence that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will also not establish liability since even adequately trained officers may make mistakes. *See id.* at 391, 109 S.Ct. 1197. Furthermore, for liability to attach, the identified deficiency in a city's training program must be closely related to the ultimate injury and thus the plaintiff must prove that the deficiency in training actually caused his or her injury. *See id.*

■ Plaintiff refers to two police directives (police policies) when arguing that the City is liable.[20] First, plaintiff claims that officers, in this case, failed to follow police directive # 63. This directive states in part that: "Fire Department paramedics will: 1. Respond to serious injuries/illness such as seizures, chest pains, strokes, overdoses, diabetic problems, unconsciousness, poisoning, broken bones or back injuries. 2. Assume full responsibility for the medical welfare of the person." Pl. Resp. Ex. E. Plaintiff claims that directive # 63 implies that until the fire department paramedics arrive, the City or its police department is responsible for the medical welfare of the injured person. Plaintiff also claims that directive # 63 requires that when transporting a crime victim who has yet to make a statement, an officer should accompany the victim to the hospital. Second, plaintiff alleges that defendants did not adhere to directive # 45 as to the use of police vehicles in emergency situations. Directive # 45 states in relevant part that: "E. A driver engaged in vehicle operations may: ... 4. Disregard the laws governing the parking of vehicles under ordinary circumstances, except that a police vehicle WILL NOT block access

to a fire hydrant at a fire scene, or in any way obstruct the passage of fire apparatus.... VII. PARKING ... B. Police vehicles will be parked in a legal manner unless an emergency exists." Pl. Resp. Ex. F.

In an attempt to establish municipal liability, plaintiff also states that, while the "course objective" for emergency response is adequate, Officer Beal's First Aid is "woeful" and Captain Grover's belief that 911 should be contacted only after the death of the victim is "shocking."[21] Plaintiff states: "The fact that almost three years have elapsed since Ms. Cannon [sic] injury and Captain Grover has thinking [sic] similar to Officer Beal, lead to the inevitable conclusion that there is deliberate indifference on the part of the City of Philadelphia as to First Aid competency of its' police force, at least as to a civilian." Pl. Resp. unnumbered at 15.

Additionally, attached to plaintiff's brief is an expert report from R. Paul McCauley, Ph.D., BCFE. In preparation for drafting his report, Dr. McCauley reviewed various relevant documents and statements pertaining to this case. Dr. McCauley concluded that "[f]ailing to render medical assistance or failing to call for emergency medical services, when informed of such a medical emergency by any citizen, and especially a crime victim, falls below accepted police practices." Pl. Resp. Expert Report. In a supplemental report, Dr. McCauley opined that "[w]hen Officer Beal became aware of Ms. Cannon's [plaintiff's] chest pains ... he should have radioed for Fire/Rescue as outlined in Directive 63.II.E.1 and 2. 'Fire Department paramedics will respond to serious injuries/illness such as seizures, chest pains .... [and] Assume full responsibility

---

**20.** Although plaintiff does not clarify her argument, I interpret her argument as follows: because the officers failed to comply with police directives, they were not properly trained.

**21.** I assume plaintiff is referring to Captain Grover's statement that: "We teach [to the

police officers] signs and symptoms of recognition of heart attack, we give direction as to how to deal with the catastrophic event, and we give direction when breathing and pulmonary activity stops to administer CPR and activate EMS, which means call fire rescue." Grover Dep. at 13–14.

for the medical welfare of the person.'" *Id.* Dr. McCauley stated that

> The use and parking of police vehicles in an emergency situation ... is complex.... It is essential that supervisory/command Officers monitor emergency vehicle responses and placement to ensure ingress and egress by fire trucks, EMS, and other essential emergency vehicles.... With the shooting suspect in custody and in the hospital by 1:09 p.m., the supervisor/ command Officer should have protected the scene and downgraded the general incident area consistent with Dir. 46.III.F.1.

*Id.* Dr. McCauley concluded that "[t]he failure of Off. Beal and the PPD [Philadelphia Police Department] to respond to the emergency medical needs of Ms. Cannon were contrary to PPD Directives and fell below accepted police practices and were causes of the harm she suffered." *Id.*

Defendants assert that plaintiff cannot establish that the City's training, discipline or supervision of police officers is so deficient and widespread that it constitutes "deliberate indifference" to the Fourteenth Amendment rights of its citizens. Captain Grover testified in his deposition that there are established protocols for: (1) communicating over police radio; (2) creating a command structure when police officers from multiple districts respond to an incident; (3) assuring that at the beginning of each shift, officer's handheld radios are equipped with new battery packs; (4) transportation of injured or sick people to the hospital; and (5) officer training regarding first aid, CPR, and recognition of the signs and symptoms of serious maladies. Def.Mot.Ex.C. at 8, 12–14. Therefore, defendants conclude that plaintiff's claim of municipal liability must be dismissed.

When arguing that the City is liable, plaintiff makes conclusory allegations about the defendants' non-compliance with existing police directives. Plaintiff fails to set forth the necessary evidence to sustain her claim that the officers' reactions to her

illness resulted from a failure of the City to adequately train these officers. First and foremost, while the plaintiff contends that the officers failed to follow certain police directives, she offers no evidence that the City failed to adequately train the officers. As *Canton* instructs, the fact that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability to the City, since the officer's shortcomings may have resulted from factors other than a faulty training program. *See* 489 U.S. at 390–91, 109 S.Ct. 1197. Secondly, plaintiff presents no evidence that a training deficiency actually caused her injuries, a necessary requirement to trigger liability. *See id.* at 391, 109 S.Ct. 1197. Third, plaintiff did not identify the specific training the City should have offered which would have prevented the deprivation of plaintiff's constitutional rights nor did she establish that such training was not provided. *See Reitz,* 125 F.3d at 145. Lastly, and perhaps most fundamentally, plaintiff failed to demonstrate that the training program was inadequate. *See Canton,* 489 U.S. at 390, 109 S.Ct. 1197. There is no evidence that the City's existing training program would obviously lead to constitutional violations. *See id.* Accordingly, I will grant the defendants' motion for summary judgment as to this count.

## ORDER

**AND NOW,** this __ day of February, 2000, upon consideration of defendants' motion for summary judgment, plaintiff's response, plaintiff's cross-motion for summary judgment, the pleadings, and the evidence submitted therewith, I **ORDER** that:

(1) Defendants' motion (docket entry # 7) is **GRANTED;** and

(2) Plaintiff's motion (docket entry # 9) is **DENIED.**